*In re* MARRIAGE OF MARGO KRUPP, Petitioner-Appellee, and DAVID J. KRUPP, Respondent-Appellant.

First District (6th Division)   No. 1—89—2169

Opinion filed December 21, 1990.

780

Schiller, Du Canto & Fleck, Ltd., of Chicago (Robert W. Wilcher and Sarane C. Siewerth, of counsel), for appellant.

Beermann, Swerdlove, Woloshin & Barezky, of Chicago (Howard A. London, of counsel), for appellee.

JUSTICE EGAN delivered the opinion of the court:

The respondent, David J. Krupp, appeals from the judgment of the circuit court on his petition to modify and decrease an award of permanent maintenance to his former wife, Margo Krupp. After a trial the judge ordered maintenance payments reduced by one-half, to $2,500 a month for an indefinite period, retroactive to December 15, 1987. The respondent then filed a motion for reconsideration of the modification and for the first time asked that maintenance be abated or, alternatively, that maintenance be reduced further and that the reduced payments be for a "brief, fixed period of time." The respondent also appeals from the order denying his motion to reconsider. He asks in this court that we reverse the trial court and instruct it to enter an order abating maintenance. In his reply brief he asks alternatively that we reverse the order and remand it to the trial court with instructions to award a nominal maintenance for a short, fixed period of time.

The facts are essentially uncontested. The respondent and petitioner married on September 20, 1953, and divorced on October 31, 1984. At the time of dissolution, the petitioner was 53 and the respondent was 58 years old.

Although the petitioner had earned a college degree from New York University before her marriage, she was not gainfully employed outside the home during most of her married life. Rather, she concentrated primarily on raising the couple's two children, who were emancipated at the time of dissolution.

The petitioner first sought work outside the home after the couple moved to Chicago. From January 1975 to September 1976, she worked as the program director for the North Shore YWCA. From October 1976 to July 1978, she worked as director of development for the Roger Baldwin Foundation of the American Civil Liberties Union. From July 1978 to September 1979, she was director of special events for WTTW/Channel 11. From October 1979 to May 1982, she was director of development and communications for Chicago Youth Centers. The petitioner turned her paychecks over to the respondent until sometime during her employment with the Chicago Youth Centers. The highest salary the petitioner earned at this time was approximately $34,000 a year; however, back surgery in December 1981 precluded her from working full time and the respondent testified that she was never fully employed at this salary for any appreciable length of time.

The respondent testified that he paid approximately $5,000 to $6,000 in uncovered medical bills for his wife's surgery. In June 1982, the petitioner began her own corporation which was known as Margo Krupp, Inc., through which she did consulting work just before the dissolution of the marriage.

The respondent began practicing law two years after the couple married. From February 1965 to September 30, 1983, he was a partner in a Chicago law firm which was originally known as Devoe, Shadur, Mikva & Plotkin; the firm later became known as Krupp & Miller and then Miller, Shakman, Nathan & Hamilton (Miller). In October 1983, the respondent shared offices with and paid rent to Greenberger, Krauss & Jacobs Chartered (Greenberger). Although he was technically held out as "of counsel" by the firm, he was substantially in practice for himself from October to December 1983. During this period, he reported a loss of $6,307 and capital expenditures of $6,500 for office furniture and equipment.

The parties' taxable income from employment and savings during the last six years in which they filed joint tax returns was as follows:

| Year | Margo's Wages | Interest Income | Dividend Income | Self-Employment Income | Schedule E Income |
|---|---|---|---|---|---|
| 1978 | $17,771 | $ 167 | 0 | 0 | $78,857[1] |
| 1979 | 24,115 | 425 | $ 3 | $1,123[2] | 93,985 |
| 1980 | 31,431 | 2,000 | 0 | 0 | 121,365 |
| 1981 | 34,192 | 2,109 | 0 | 0 | 125,094 |
| 1982 | 15,951 | 3,671 | 0 | 83 | 125,531 |
| 1983 | 2,000[3] | 5,740 | 256 | -6,307[4] | 132,896[5] |

The parties' disposable income after payment of income and social security taxes was as follows: $61,187 in 1978; $72,402 in 1979; $89,487 in 1980; $97,707 in 1981; $96,465 in 1982; $93,078 in 1983.

By 1984, the couple lived comfortably in a four-bedroom condominium, owned a 1980 Buick, owned a one-third interest in a small sailboat and belonged to the East Bank Club. They entertained and traveled, but the respondent testified that, in later years, most of their travel was business related. The couple contributed approximately $4,000 to charity each year. They contributed $2,700 per year to support the respondent's mother and loaned their daughter $11,500 in 1982 and 1983. They also made retirement contributions to IRA's and a Keogh plan totalling $28,900. The respondent testified that he borrowed funds to meet various obligations. Specifically, he borrowed funds to help pay for certain living expenses such as the petitioner's medical expenses and the children's education. The couple paid their son's college and graduate school tuition and room and board at Yale apparently from 1975 until 1982. The petitioner testified that the couple's lifestyle cost more than he earned. In 1983 and 1984, he withdrew more than his share of income from the law firm which, in turn, depleted his capital account. The respondent estimated that the petitioner earned more than $40,000 during the last four years of their marriage which she deposited into her own accounts. At the time of dissolution, the respondent owed $50,000 in loans he had taken out on several insurance policies.

[1] Respondent's taxable income from Miller less unreimbursed business expenses.

[2] Petitioner's income from consulting.

[3] Petitioner's salary from her wholly owned corporation, Margo Krupp, Inc., which operated at a loss of $5,220 for the year.

[4] Loss from the respondent's solo practice incurred during the last three months of 1983.

[5] Respondent's taxable income from Miller reportable in 1983, less unreimbursed business expenses was $138,116. This amount was partially offset by a $5,220 loss from the petitioner's corporation, resulting in the net figure of $132,896 as Schedule E Income.

In 1984, the year of dissolution, the petitioner continued her consulting work through Margo Krupp, Inc.; the respondent became officially employed by Greenberger. On her separately filed tax return, the petitioner reported total income of $12,873 which included $10,000 in maintenance payments and $945 in dividends; she reported no income from employment of any kind, reporting instead a loss of $900 from Margo Krupp, Inc. The respondent reported $150,500 in wages from Greenberger and $114,382 in Schedule E income from Miller of which he received all but $32,000 in 1983. He paid approximately $105,299 in Federal and State income taxes and FICA in 1984. He also paid the petitioner $10,000 in maintenance and $3,000 in legal fees. For three months, he continued to make payments of $746 per month as principal, interest and taxes on the couples' jointly owned condominium in which they both lived until a few weeks before entry of the order of dissolution. He also continued to fund the petitioner's checking account until the beginning of October. The respondent reported $41,393 as his net cash flow from the practice of law in 1984.

A lengthy and detailed marital settlement agreement was specifically incorporated into the judgment for dissolution. Under its terms the respondent agreed to pay the petitioner permanent maintenance of $60,000 annually, payable in the sum of $5,000 each month. The respondent testified that the parties directly negotiated this figure between themselves. Payments were to continue until either the respondent's death or the petitioner's death, cohabitation or remarriage. The parties specifically provided that the terms of maintenance were predicated on the represented income of the parties, the style of living established during the marriage and the potential of each party for acquiring future assets. The petitioner retained the right to occupy the couple's condominium until it was sold, paying associated maintenance fees; the respondent was obligated to pay the mortgage. The petitioner agreed to quitclaim her interest in the condominium to the respondent upon its sale so that he could partially shelter the anticipated capital gains with the $125,000 life-time exemption under the Internal Revenue Code. In so doing, the respondent bore the burden of the capital gain realized in the sale of the unit.

The respondent also agreed to maintain four life insurance policies for the petitioner's benefit until he met his obligations under the agreement. He further agreed to maintain term life insurance for the petitioner's benefit which he received through Greenberger and to replace as much of it as he could obtain for the premium charged to the firm should he ever leave the firm.

The petitioner received marital assets totalling $210,623.18 includ-

ing $40,161.95 in bank accounts and securities, $5,461.23 in an IRA account and $165,000 in cash from the sale of the condominium which was paid to her at the closing in early 1985. She also received a 1980 Buick and certain household goods and furnishings.

The respondent received marital assets totalling $169,698.52 and $24,000 in nonmarital property inherited from his mother as well as the parties' one-third interest in a sailboat. Of the marital property allocated to the respondent, $12,095.54 was in IRA accounts, $31,500 was invested in the Keogh plan of his former firm of Miller and $65,000 represented his interest in the sale proceeds of the condominium. The agreement provided that the respondent would receive $11,964 in receivables from Miller and the monies, receivables and unbilled time which were credited to his account at the firm of Greenberger.

In the years following the dissolution, the petitioner's earned and taxable income rose steadily. In 1985, she reported $75,434 in total income of which $2,000 was earned through her consulting firm and $60,000 was maintenance. The petitioner did consulting work for the law firm Sidley & Austin (Sidley) for about 1½ years. She testified that the respondent was fully aware of her position, the hours she worked and the wages she was paid. She estimated that she earned approximately $25,000 in 1985 and $30,000 in 1986. On November 3, 1986, she became the director of practice development for the law firm, Schiff, Hardin & Waite (Schiff). She received a fixed salary of $55,000 per year, major medical insurance and an opportunity to participate in a retirement plan. She was hired to work in what she described as the new field of legal marketing. As director, she helped lawyers develop marketing strategies to retain and expand their legal business. She estimated that about 10 to 12 other people perform similar jobs for other law firms in the Chicagoland area. Of these professionals, most are her junior by 10 to 15 years; only one other is approximately her age.

In 1986, she reported $100,528 in total income of which $24,440 represented income from her corporation for services performed for Sidley; $7,404 represented wages earned from Schiff and $60,000 was maintenance. In 1987, the petitioner reported earning $125,031 in total income of which $55,393 represented wages earned from Schiff; $1,318 represented Schedule E income; and $60,000 was maintenance. Pay stubs from Schiff indicated that the petitioner earned $31,204.34 in gross income for the first 4½ months of 1988. As of February 2, 1989, the petitioner's salary at Schiff increased from $61,000 to $64,000 a year.

On the other hand, the respondent's earned and taxable income fluctuated in the years following dissolution. In May 1985, he became a contract partner at Greenberger, billing his personal time at $200 an hour; he was still paid as an employee of the firm. He reported $197,151 in total income in 1985 of which $151,628 represented earned income from Greenberger and $25,267 was income earned from Miller which was reportable in 1985 but which was actually received in 1984. He paid $65,830 in maintenance and insurance premiums for the petitioner's benefit. In 1986, he reported $140,441 in total income of which $131,968 represented earned income from Greenberger and $5,482 was income earned from Miller reportable in 1986 but actually received in 1985. He paid $65,593 in maintenance and insurance premiums for the petitioner's benefit.

In May 1987, he voluntarily left Greenberger to practice law as a sole practitioner. In June 1987, he began renting office space from Neal, Gerber & Eisenberg (Neal) paying $1,000 in monthly rent. Although his secretary was on Neal's payroll, he reimbursed the firm for her services in the amount of approximately $25,000 to $26,000 plus insurance.

The respondent remarried in September 1987. He continued to practice primarily commercial and corporate transactional litigation. He testified that his earnings were down in 1987 and he did not anticipate a prosperous year; business was poor. In October 1987 he had merely four active files, only one of which was substantial. Although the respondent admitted grossing approximately $180,000 in salary during the first six months of 1987, he claimed that he had no receivables during the last couple of months before October 1987. He earned $167,304 in gross receipts for the year. He reported earning $182,176 in gross wages from Greenberger and $57,423 in net income from his sole practice. He paid $66,814 in maintenance and insurance premiums for the petitioner's benefit.

In 1988, the respondent continued renting office space and services from Neal as a sole practitioner. As of July 12, 1988, he reportedly received $52,925.73 in cash receipts and incurred expenses totalling $17,759.24 from his law practice.

On March 1, 1988, the respondent became an income partner at Neal with a guaranteed draw computed at an annual rate of $160,000; he had no guaranteed bonus. He accepted the partnership at a compensation level below his 1987 income because that income had been based primarily on one large case in which his involvement had ended. He did not have a continuing client base; most of his business came from referrals within the legal profession. He had not previously been

nor did he anticipate becoming involved in any comparably lucrative matters.

The director of administration of Neal testified that the respondent became an equity partner at the firm on January 1, 1989, earning a draw of $11,750 per month or $141,000 a year against a 2.5% share of the firm's profits. If the firm were to experience a loss for the year, the petitioner would not receive any compensation beyond his draw. There were no projections for the firm's 1989 calendar year regarding partnership distributions as of the date of the last evidentiary hearing.

As of December 1987, the petitioner's assets had grown to $280,885.42 (from $210,623.18 in 1984), which included $120,000 of equity in her mortgage-free condominium. On July 21, 1988, her assets totalled $311,446.82 and included marketable securities with a then-current market value of $44,445 (up from $35,249.50 in 1987), money market and checking accounts with a total balance of $133,817.53 (up from $115,138.36 in 1987) and IRA accounts totalling $13,184.29 (up from $10,497.66 in 1987). Again, this total included $120,000 of equity in her Chicago condominium.

As of December 1987, the respondent's assets apparently totaled $176,209.17 including a Keogh Plan and IRA deposits of $68,199 and $70,000 of equity in his condominium; his liabilities included a $40,000 mortgage and an estimated tax liability of $40,000 which was due in April 1988. His monthly expenses totalled $5,045.93. (A list of the respondent's assets and liabilities as of mid-December 1987 was marked and admitted as Exhibit No. 17 but was not included among the exhibits anywhere in the record. The only evidence in the record regarding the respondent's assets and liabilities as of 1987 consists of his tax returns, his general testimony and a reference by the trial court in its opinion. We can find no evidence in the record of the growth of the respondent's assets as of July 1988.)

The respondent first moved to modify maintenance pursuant to section 510(a) of the Marriage and Dissolution of Marriage Act, which permits modification upon finding a substantial change in the circumstances of the parties on December 1, 1986. (Ill. Rev. Stat. 1985, ch. 40, par. 510(a).) The respondent essentially alleged that the petitioner's employment which generated $55,000 in income in 1986 constituted a substantial change in circumstances from her financial situation at the time of dissolution. He also argued that, while the petitioner's income had increased steadily to the point where she was self-sufficient, his income had decreased since dissolution.

The trial judge conducted hearings on the respondent's petition at

the end of which the judge denied the petitioner's motion for a finding in her favor. The respondent was granted permission to reopen the proofs and hearings continued. On March 7, 1989, the judge issued her findings of fact and rendered a decision modifying the maintenance award.

The judge found that the maintenance provision of the settlement agreement and judgment for dissolution was modifiable based on a substantial change in the parties' circumstances. She was especially persuaded by the petitioner's improved financial condition. She specifically found that the petitioner's consulting business had produced $2,000 in income in 1983 and a loss in 1984. However, since dissolution, the petitioner had steadily improved her financial position having secured full-time employment, most recently earning $64,000 in salary a year. Despite testimony regarding the petitioner's age and the fact that her position constituted a relatively new endeavor in marketing, the judge found that the record did not reflect a "frailty" in her position. Recognizing that the petitioner's income was now augmented by her maintenance, the judge concluded that the change in the petitioner's income constituted a substantial change that necessitated modification in maintenance. She further acknowledged that the petitioner's income was greater than the respondent's income after taxes and maintenance payments but found it inappropriate to give too much weight to the comparison in light of the length of the marriage and the disparity in the parties' ability to produce income in the future. The judge also acknowledged that the petitioner had no mortgage or rental expenses; that she received income-producing assets in the original settlement; that her investments produced income and dividends which had increased in value and that she did not need to diminish her assets to live. However, the judge concluded that she knew more about the respondent's ability to pay maintenance than she did about the petitioner's need for it. The judge believed that the petitioner's failure to offer specific evidence of her need for maintenance was consistent with the petitioner's legal theory that the maintenance provision of the judgment was non-modifiable because it had been characterized as permanent. The judge further believed that neither termination of maintenance nor indefinite maintenance was consistent with the parties' intentions. Given the fact that the petitioner's income had nearly doubled and given the paucity of information about her expenses, the judge found it appropriate to reduce maintenance payments from $5,000 a month to $2,500 a month.

On April 17, 1989, the judge held hearings on the respondent's motion for reconsideration. The respondent argued that the judge had

misapplied the factors which section 504 of the Marriage and Dissolution of Marriage Act required the trial court to consider in granting maintenance awards. He contended that the petitioner had failed to present any evidence of her expenses, of her inability to meet her expenses and of her need for maintenance and, therefore, was not entitled to any maintenance. Rejecting the respondent's contention, the judge held that, in the final analysis, the respondent had the burden of proof which he failed to meet. Although the respondent proved a substantial change in circumstances, he did not prove that the petitioner no longer required some maintenance to live in the style to which she had become accustomed during the marriage. The respondent now maintains that the judge's decision was against the manifest weight of the evidence.

■■ ■ Section 510(a) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 510(a)) provides that any judgment regarding maintenance can be modified only upon showing a substantial change in the circumstances of the parties. Under this provision, an award of maintenance may be modified regardless of whether it is characterized as permanent or temporary as long as it does not explicitly preclude such modification. (See *In re Marriage of Arvin* (1989), 184 Ill. App. 3d 644, 651, 540 N.E.2d 919; see also *In re Marriage of Bryant* (1990), 206 Ill. App. 3d 167, 171.) This provision also applies to situations in which a party seeks to terminate (or abate) an award of maintenance. (*In re Marriage of Whiting* (1989), 179 Ill. App. 3d 187, 192, 534 N.E.2d 468; see also *Ingrassia v. Ingrassia* (1987), 156 Ill. App. 3d 483, 488, 509 N.E.2d 729.) We reject the petitioner's argument that the settlement agreement by its terms precludes termination (or abatement). The agreement provides that maintenance shall terminate upon the occurrence of certain events. That language does not mean that maintenance may not be terminated if her financial condition becomes such that it is no longer needed.

■■ ■ We will first consider the respondent's contention that the petitioner was not entitled to any maintenance because she failed to prove her need for it. The party seeking modification of maintenance has the burden of demonstrating that a substantial change of circumstances has occurred. (Ill. Rev. Stat. 1987, ch. 40, par. 510(a); *Arvin*, 184 Ill. App. 3d at 651.) The judge found that the respondent demonstrated a substantial change in circumstances by comparing the petitioner's economic position at the time of dissolution when she was not gainfully employed to her current position when she was earning $64,000 a year. The petitioner does not dispute that finding. Since the

judge made that finding, the respondent argues, the burden shifts to the petitioner to establish her right to *any* maintenance. We interpret the respondent's argument to be that once a judge finds that maintenance should be modified, it should be modified to zero, unless the recipient of maintenance can establish to what degree over zero the maintenance should be modified. The respondent cites no authority for such a rule other than selected language from a treatise authored by the petitioner's counsel. (Beermann & London, *Rehabilitative Maintenance in Illinois*, 75 Ill. B.J. 658, 664 (1987).) That selected part of the treatise referred to maintenance for a limited period of time. It recognized that the "technical burden of proof may be on the movant" but added that the "burden can *probably* be satisfied by showing that the recipient spouse has the ability, and has had sufficient time and opportunity to become self-sufficient. The recipient spouse will then have to prove that he or she has satisfied the continuing obligation to attempt to become self-supporting." (Emphasis added.) (75 Ill. B.J. at 664.) We do not find that authority, such as it is, applicable to the facts of this case. In any event, the trial judge rejected that proposed rule; so do we.

The petitioner contends that the question of a shifting burden of proof was not raised by the respondent in the trial court. The petition for modification upon which the hearing was held was just that, a petition for modification, not for termination or abatement. The petition for modification asked for an order "modifying and decreasing the amount" of maintenance. Under the pleadings the principal issue was whether there was substantial change in the petitioner's position from the time of the dissolution order that would justify any modification. The petitioner contended that there was no such substantial change. At the hearing on the motion to reconsider, the respondent's attorney informed the judge that the original petition for modification asked for an abatement of maintenance. He misspoke. The petitioner's attorney at that hearing on the motion to reconsider had substituted for the petitioner's trial counsel less than a month before the hearing. Consequently, his failure to correct the misstatement is understandable to a degree. The only reference to abatement made at the original hearing, and it was an oblique one, was made by the respondent's attorney during his oral argument when he said that "maintenance must stop." Later, he argued that the respondent had the burden of showing a substantial change in circumstances, that he had sustained that burden and that the petitioner had to show what her needs were. He repeated the same arguments on the motion to reconsider; the petitioner's attorney answered the argument; and the judge addressed

those arguments. Consequently, although we believe that the respondent's suggested rule could have been advanced more clearly through the pleadings and his argument at the first hearing, we find no waiver and we deem it appropriate to address it.

██ Implicit in the respondent's argument is the assumption that proof of need and proof of a change in circumstances are separate and distinct. That assumption is incorrect. The need of the recipient spouse is one of the circumstances the court is to consider in determining the original award of maintenance. Similarly, a change in the need of the recipient spouse would be a circumstance to be considered in determining whether an award should be modified; and the burden of establishing such a change in the need rests with the movant. (See *In re Marriage of Garelick* (1988), 168 Ill. App. 3d 321, 522 N.E.2d 738.) In sum, we do not accept the respondent's argument that the petitioner had the burden of establishing a right to any maintenance once a substantial change of circumstances had been established by proof that her income had increased. Nor do we accept the respondent's argument that a conclusive presumption arose against the petitioner because of an alleged failure to produce evidence of her needs. The judge recognized that a reasonable explanation for the petitioner's failure to produce such evidence existed because the battleline had been drawn by the petition for modification and the petitioner defended on the grounds that the dissolution agreement itself barred any modification and that there was no substantial change that would justify any modification. Moreover, we infer from the judge's remarks that she considered the absence or paucity of the petitioner's evidence of need adversely to the petitioner when she reduced maintenance.

██ We turn now to the question of whether the judge's refusal to abate the maintenance award was against the manifest weight of the evidence. As previously noted, in determining whether and to what degree maintenance should be modified, a trial court should consider the same factors that it considers in making an initial award. (*In re Marriage of Chalkley* (1981), 99 Ill. App. 3d 478, 482; *Garelick*, 168 Ill. App. 3d at 326.) Section 504(a) of the Act authorizes the trial court to award maintenance only if it finds that the party seeking maintenance lacks sufficient property, including apportioned marital property, to provide for his reasonable needs; is unable to support himself through appropriate employment or is otherwise without sufficient income. (Ill. Rev. Stat. 1987, ch. 40, par. 504(a).) The reasonable needs of a party are determined in light of his overall circumstances which include the standard of living during the marriage. *Arvin*, 184 Ill. App. 3d at 651.

■■■ Under section 504(b), the maintenance award is to be in an amount "as the court deems just" after considering all relevant factors including the financial resources of the party, including marital property apportioned to him, and his ability to meet his needs independently (section 504(b)(1)); the time necessary to acquire sufficient education or training to enable the party to find appropriate employment (section 504(b)(2)); the standard of living established during the marriage (section 504(b)(3)); the duration of the marriage (section 504(b)(4)); the age, physical and emotional condition of both parties (section 504(b)(5)); the ability of the spouse paying maintenance to meet his needs while meeting those of the petitioner (section 504(b)(6)); and the tax consequences of the property division upon the economic circumstances of the parties (section 504(b)(7)). (Ill. Rev. Stat. 1987, ch. 40, par. 504(b).) No one factor is determinative. (*In re Marriage of Jones* (1989), 187 Ill. App. 3d 206, 228, 543 N.E.2d 119.) Courts have wide latitude in considering what factors should be used in determining reasonable needs, and a trial court is not limited to the factors listed in the statute. (*In re Marriage of Simmons* (1980), 87 Ill. App. 3d 651, 657-58, 409 N.E.2d 321.) Except where the financial situation of the paying spouse, the duration of the marriage or the health of the parties indicates otherwise, the amount of maintenance should be sufficient to provide the spouse with the standard of living established during the marriage. (87 Ill. App. 3d at 660.) The amount is reduced by the amount the party has available to provide herself with the standard of living.

The respondent deems determinative the fact that the petitioner's current income is allegedly greater than the parties' average income during the marriage. On this basis, he claims that the petitioner, who was earning $64,000 in 1988, has the resources and income to meet her reasonable needs. His trial exhibits show that the parties had an average income of $135,900 per year during the last six years of marriage. He also points out that the value of the petitioner's resources has increased from $210,623 to $280,885 (as of 1987) and to $311,000 (as of mid-July 1988), consisting of over $175,000 in cash and marketable securities, a two-bedroom, mortgage-free condominium valued at $120,000 and over $13,000 in IRA accounts. Ascribing a fair rate of return to the financial assets of the petitioner, the respondent argues that her salary and investments give her more than 50% of the couple's average yearly income before taxes during the last years of their marriage. Thus, he concludes that the petitioner no longer needs maintenance. We do not agree that that conclusion has been established as a matter of law.

■ First, as discussed further below, we do not believe that the growth of the petitioner's assets necessarily indicates a lack of need for maintenance. Although the court may take judicial notice of the fair earning powers of money or invested capital over a certain time period (*In re Marriage of Ryman* (1988), 172 Ill. App. 3d 599, 527 N.E.2d 18), the petitioner's improved financial condition cannot be measured primarily by assets derived from the divorce settlement. (*In re Marriage of McGowan* (1980), 84 Ill. App. 3d 609, 405 N.E.2d 1156.) Therefore, we focus especially on the petitioner's salary which constitutes the principal change in her position.

Contrary to the respondent's argument, the petitioner's increased income does not alone mandate either termination or abatement. (See *Whiting*, 179 Ill. App. 3d 187; *Arvin*, 184 Ill. App. 3d 644.) As large as her income is, there is no evidence that it enables the petitioner to meet her reasonable needs. (*Simmons*, 87 Ill. App. 3d at 660.) Reasonable needs are measured by the standard of living enjoyed during her marriage. In this case, there is no evidence that the petitioner was able to comfortably satisfy her needs without maintenance.

■ We cannot assume that the petitioner is able to support herself in the marital lifestyle simply because her net employment and investment income exceeds 50% of the parties' total disposable income during the last years of marriage. Living apart costs most couples more than living together. (See *Simmons*, 87 Ill. App. 3d at 661.) More importantly, the respondent's calculations erroneously assume that the petitioner's income has as much buying power today as it would have had in the last years of the marriage. Although inflation alone is not an appropriate basis upon which to increase maintenance, contrary to the respondent's argument, we cannot ignore its role nor is there any authority compelling us to do so under the facts of this case. See *Shive v. Shive* (1978), 57 Ill. App. 3d 754, 373 N.E.2d 557; see also *Chalkley*, 99 Ill. App. 3d at 483 n.3.

The Consumer Price Index indicates that the cost of living in the Chicago area rose by 22% between the last few years of the marriage (1981-1983) and the date of the evidentiary hearings (1987-1989). The parties' average disposable income during the last six years of marriage was $85,055. The petitioner's 1987 after-tax income, including $60,000 in maintenance, was approximately $80,779. There is no evidence in the record of her 1988 tax liability, but we can assume that her income was slightly higher due to an increase in salary. Therefore, we can again reasonably assume that the petitioner's after-tax income in 1988, again including $60,000 in maintenance, was somewhere between $80,000 and $85,000. (The respondent, in fact, estimates the

petitioner's income at $78,000 in 1989 after imputing an 8% return on her cash and securities of approximately $175,000.) After adjusting the petitioner's disposable income by the 22% increase in the cost of living since 1981-1983, we can conclude that her 1987-1988 disposable income of $80,000 to $85,000, including maintenance, is roughly equivalent to $65,000 to $69,000 in 1981-1983 dollars.

The trial court's order decreased the petitioner's maintenance by $30,000 per year, retroactive to mid-December 1987. This results in a net decrease in the petitioner's income of $21,000 per year ($30,000 less approximately $9,000 in income taxes). Therefore, the petitioner's net disposable income under the trial court's order will be approximately $59,000 to $64,000 per year ($80,000 to $85,000 less $21,000). This is equivalent to $52,400 in 1981-83 dollars, which is 54.7% of the couple's joint disposable income in 1981-83 (compared to the average of $95,750 per year).

The petitioner testified that she went back to work after a divorce so that she "could build up money so that later on [she would] have something to live on." She said that the money she was getting from the respondent was not enough to support her in the lifestyle that she had spoken of; that she was no longer able to belong to the East Bank Club, she had an eight-year-old car, and she did not travel except to visit her children and her mother; and that there had been numerous changes to her lifestyle. The judge had the right to consider that testimony.

Additionally, the petitioner is obligated to refund the respondent the sum of $37,500. The repayment is being made at a rate of $2,500 per month as an offset against current maintenance and further reduces the petitioner's available income. With this in mind, we cannot assume that the petitioner's current income enables her to live as she did during the last few years of her marriage as measured by the parties' income.

We believe the judge properly considered the growth of the petitioner's assets, which increased $70,262 from the time of dissolution in 1984 to the time the respondent moved for modification in December 1987. The majority of this increase was due to the petitioner's investment of proceeds she received under the divorce settlement. We are persuaded that, had the petitioner not received maintenance during this period, she would have had to deplete her savings rather than increase them.

The petitioner's assets further increased an additional $30,561.40 between December 1987 and July 1988. Of this amount the respondent shows that $9,196 resulted from the appreciation of certain

stocks. Therefore, we can reasonably conclude that the balance ($21,365.40) resulted from the accrual of interest and dividend income or cash deposits. Of this amount, $3,752.05 represent the petitioner's reinvested dividend and interest income from her Kemper ($999.29) and Unibanc ($2,752.76) accounts. Thus, approximately $17,613.35 of the increase in assets as of 1988 could have resulted from cash deposits between December 1987 and July 1988. This represents an average of $2,202 per month, which is approximately only one-fourth the average sum spent on savings and retirement contributions during the final years of the marriage. Reducing the petitioner's maintenance by $2,500 per month retroactive to December 1987 substantially affects her ability to provide for her own future security. While it is true that neither the statute nor the judgment of dissolution gives the petitioner a vested right to set aside $2,202 per month for savings, the statute does give her the right to an amount which is sufficient to provide her with the means to satisfy her reasonable needs. Future savings were an important part of the marital lifestyle, and we are not prepared to say that the petitioner has lost her right to future security because she is divorced. We recognize that the respondent is arguably nearing retirement, but we also recognize that he was awarded over eight times as much money in IRA and retirement accounts than was the petitioner at the time of dissolution. While the petitioner's IRA accounts have grown to $10,497 as of December 1987, the respondent's have grown to more than six times that amount.

After considering the age of both parties and the level of achievement in their "professions," we believe the judge exercised reasonable discretion when she manifested her concern for the lesser potential of the wife's earning ability to secure future savings. Therefore, we do not believe the judge erred when she implicitly concluded that the petitioner's assets did not warrant abatement.

Of the cases cited by the respondent to support his contention that the trial court should have terminated or imposed a more modest award of maintenance for a short, fixed period of time, the most arguably persuasive is In re Marriage of Henzler (1985), 134 Ill. App. 3d 318, 480 N.E.2d 147. However, we do not find Henzler dispositive. In Henzler, the appellate court reversed the trial court's denial of the respondent's petition to terminate or abate his ex-wife's maintenance of $1,000 per month where the ex-wife went from being unemployed with no income to obtaining a college degree in accounting and a job that paid a gross annual salary of $20,000 per year. We find Henzler distinguishable in several important respects. First, unlike this case,

the dissolution agreement in *Henzler* expressly stated that maintenance was to be provided only as long as it was necessary to allow the petitioner to become self-supporting. In this case, the parties agreed to permanent maintenance. We recognize that the goal of rehabilitation is not implicit in every award of maintenance; however, we believe that the characterization of the award reflects the parties' expectations and cannot be ignored. The trial judge properly noted that termination was not consistent with the parties' expectations. More importantly, *Henzler* is limited to its facts and, again unlike this case, the *Henzler* record contained evidence of the petitioner's expenses including expense affidavits. Thus, the *Henzler* court had greater evidence from which to conclude that the petitioner had achieved self-sufficiency and economic rehabilitation. There was also evidence from which to conclude that the future security/employability of the petitioner in *Henzler* was more certain than that of the petitioner in this case. For example, the *Henzler* petitioner was on her way to becoming a certified public accountant. There is also evidence from which to conclude that the *Henzler* petitioner was at least 10 years younger than the petitioner in this case.

Each of the remaining cases which the respondent cites is distinguishable. (*In re Marriage of Jones* (1989), 187 Ill. App. 3d 206, 543 N.E.2d 119; *In re Marriage of Hackett* (1986), 113 Ill. 2d 286, 497 N.E.2d 1152; *In re Marriage of Rentivenga* (1982), 109 Ill. App. 3d 967, 441 N.E.2d 336.) None involves proceedings for modification in which the movant must have met a specific burden of proof. More importantly, each represents instances in which the appellate court deferred to the trial court's exercise of broad discretion and affirmed its initial award of maintenance or lack thereof. Having considered the strict standard by which we determine an abuse of discretion, we believe that each affirmance means that the trial court's ruling was permissible and nothing more.

■ After considering the current circumstances of the parties, we cannot say that the trial court misapplied the factors contained in section 504(b). The parties were married approximately 31 years. The petitioner was 57 and the respondent was 63 years old in 1988. From these facts alone, we may conclude that the parties have relatively equal rights to satisfy their reasonable needs out of the available income. (See *Simmons*, 87 Ill. App. 3d at 661.) However, for 22 years the petitioner's sole occupation was that of wife, mother and homemaker. Although she has now been in the work force nearly 15 years, she has been earning over $55,000 annually for only three of those years. The respondent, on the other hand, has been employed as an

attorney since 1955 and has been a partner in one law firm or another for the better part of 25 years. Not only was he initially awarded over eight times the amount in savings and retirement accounts than was the petitioner, but he has earned well over $100,000 for at least the past eight years. The fact that the petitioner's income now exceeds the after-maintenance income of the respondent cannot control, as no one factor is determinative. (*Jones*, 187 Ill. App. 3d at 228.) Although the respondent apparently suffered a decrease in income at the time he initially sought modification, the record indicates that he has a guaranteed income of at least $141,000 and is well able to provide the maintenance payments ordered by the court. More importantly, he makes no attempt to show a decrease in his ability to pay. (See *In re Marriage of Geis* (1987), 159 Ill. App. 3d 975, 984, 512 N.E.2d 1354.) Finally, there is no evidence to suggest that the respondent's ability to produce income in the future is not greater than that of the petitioner.

■■ This case was well tried and exhaustively briefed and argued in this court. Like many cases of this nature, the question was a close one. (See *Garelick*, 168 Ill. App. 3d at 326.) The arguments advanced by the respondent are not lightly to be dismissed. But the question before a reviewing court is not what the judges of that court would have decided. To justify our interference it must be obvious that the trial judge acted arbitrarily and abused her discretion. In view of all the circumstances, we cannot say that the trial judge acted arbitrarily or without conscientious judgment or that her order either exceeds the bounds of reason or ignores recognized principles of law so that substantial injustice results. As long as reasonable persons may differ as to the propriety of the judge's action, we cannot say she abused her discretion in refusing to abate maintenance. *In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 1127, 398 N.E.2d 126.

■■ Neither can we say that the judge abused her discretion in refusing to reduce maintenance further for an unlimited period of time. The petitioner is now 59 years old. She has been employed in a relatively new field of legal marketing and earning substantial income for only approximately three years. Although the judge did not find any insecurity in the petitioner's position of employment, there is evidence from which to conclude that other persons who are similarly employed are far younger than she. Maintenance awards must be based on circumstances disclosed by the evidence and not on speculation. (See *In re Marriage of Wade* (1987), 158 Ill. App. 3d 255, 511 N.E.2d 156.) The judge could have reasonably concluded that the record was speculative as to the petitioner's future security and eco-

nomic independence. The judge was in a position to evaluate and assess the financial abilities of the parties, and we will not second-guess her evaluation. See *In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 450 N.E.2d 1229.

For all these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

LaPORTA, P.J., and McNAMARA, J., concur.