*In re* MARRIAGE OF SHERYL R. JOHNSON, Petitioner-Appellant, and LARRY E. JOHNSON, Respondent-Appellee.

Fourth District   No. 4—90—0745

Opinion filed June 18, 1991.

James E. Elmore, of Elmore & Reid, of Springfield, for appellant.

Steven Nardulli, of Stratton, Dobbs, Nardulli & Lestikow, of Springfield, for appellee.

176

JUSTICE McCULLOUGH delivered the opinion of the court:

Petitioner Sheryl Johnson appeals from an order terminating the maintenance payments she received from respondent Larry E. Johnson. Petitioner contends the trial court abused its discretion in granting respondent's motion to terminate maintenance. We reverse.

The record shows an order was entered on October 6, 1989, dissolving the parties' marriage. In the order, petitioner was awarded permanent maintenance from respondent in the amount of $500 per month. On March 5, 1990, respondent filed a motion to terminate the maintenance order. Respondent alleged petitioner was residing on a resident, continuing conjugal basis with Paul Bruketa in Florida and, therefore, his obligation to pay maintenance was terminated pursuant to section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1989, ch. 40, par. 510(c)), which provides in pertinent part:

> "Unless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis."

At a hearing on the motion, petitioner testified she moved to Gulf Breeze, Florida, after her divorce from respondent in October 1989. Petitioner had visited friends in Gulf Breeze prior to her divorce and became interested in opening a beauty salon in Gulf Breeze offering facial toning services. After petitioner was unable to buy a home in Gulf Breeze, she rented a room from June King in October 1989 at $150 per month and signed a six-month lease. June King was interested in working in the beauty salon with petitioner. Petitioner moved a few of her personal things into King's home, including a bed, and stored her remaining items in a self-storage facility in Gulf Breeze. Petitioner gave King's address as her address to this facility.

Paul Bruketa, who lives in Gulf Breeze, and petitioner grew up together in Lincoln, Illinois. Upon arriving in Florida in October 1989, petitioner opened two local bank accounts and had Bruketa's address printed on her checks for the checking account and used his address as her mailing address. Petitioner had her mail forwarded from Lincoln to Bruketa's address until February 16, 1990, when she opened a post office box in Gulf Breeze. Petitioner testified she was advised by a postal worker in Lincoln to have her mail forwarded to a friend's address rather than a post office box because the service would be more dependable. Petitioner explained she used Bruketa's telephone number and re-

corded a message on his telephone number because she was starting a business with him and she used his apartment for work along with King's home. Petitioner frequently spent the night at Bruketa's apartment, where she slept on the couch. Petitioner kept track of when she stayed there (as opposed to King's house or another friend's house) on a personal calendar. Petitioner also parked her 1988 Camero in Bruketa's parking lot about half the time because there was so much sea spray, which would damage the paint on her car, at King's address. Petitioner gave Bruketa a set of keys to her car. King lived a half mile from the water; Bruketa lived three-quarters of a mile from the water. Petitioner denied having a sexual relationship with Bruketa.

Petitioner testified she paid King in cash for the rent and occasionally exchanged services for the rent each month. Petitioner had $700 in cash when she moved to Florida in October 1989 and she received $161.29 income in December 1989 from the beauty salon business. Petitioner stated she went to the grocery store only two times between October 1989 and July 1990 because she did not cook. She ate one meal a day, which consisted of a salad from McDonald's.

Petitioner admitted receiving on March 19, 1990, by certified mail, a copy of the motion to terminate maintenance. After receiving the motion, petitioner acknowledged she began "crossing out" Bruketa's address on her checks. Petitioner denied telling anyone she lived at Bruketa's address and specifically denied telling a private investigator hired by respondent in February 1990 that Bruketa's apartment complex was a nice place to live. Petitioner stated when she left her car at Bruketa's apartment, she had other people drive her around because she was unfamiliar with the area and because she suffers from narcolepsy, a sleeping disorder which prevents her from driving long distances. Petitioner testified she did not know the names of any of her neighbors at King's address.

Petitioner stated she had dated three men since she moved to Florida in October 1989. Between October 1989 and March 1990, petitioner had only $1,800 in cash or $300 per month and she used these funds to pay for her rent, gas, and meals each month. Her checking account was used for other purchases.

Ronald G. Brown, a private investigator hired by respondent in February 1990, testified he went to Bruketa's address in Gulf Breeze on February 4, 1990, to determine whether Bruketa and petitioner were living together at that address. Brown saw petitioner's car parked in the parking lot and succeeded, through a ruse, in talking to petitioner about how it was to live at the apartment complex. According to Brown, petitioner stated it was nice to live there. When Brown asked petitioner

the question, Bruketa was standing too far away to hear the conversation. Brown returned later that evening and again on the next day and noticed petitioner's car was still in the parking lot and the lights were off inside Bruketa's apartment. Brown admitted he did not know whether petitioner and Bruketa were in the apartment at the time the lights were off. On February 9, 1990, Brown observed Bruketa and petitioner in a local K mart in Pensacola where Bruketa put his arm around petitioner and at one point it looked like Bruketa was holding a belt loop on the back of petitioner's pants. When they left the store, Bruketa approached the driver's side of petitioner's car and opened the door with a set of keys he pulled out of his pocket. Brown inquired at the local post office in late February 1990 if petitioner could be found at King's address and was told she could not. Brown also talked to the maintenance man at Bruketa's apartment complex, who told Brown petitioner was living with Bruketa as far as he knew. The maintenance man also reportedly told Brown that Bruketa mentioned in June 1989 that he was moving some of petitioner's belongings into his apartment. Brown also called Bruketa's telephone number and heard a message in petitioner's voice which directed persons to leave a message so she (petitioner) could return the call. Brown reported Bruketa's car had expired license tags when he observed it in the parking lot outside the apartment complex.

Bruketa testified he had known petitioner for approximately 34 years and considered her a friend and business associate. Bruketa allowed petitioner to stay with him when she visited the Gulf Breeze area before her divorce in October 1989. Bruketa then assisted petitioner when she moved her personal belongings from Lincoln to Gulf Breeze by U-Haul. Petitioner paid for the rental of the U-Haul and gas and other expenses. According to Bruketa, petitioner paid for her storage area in Gulf Breeze. When petitioner stayed with Bruketa, she slept on the couch. Petitioner would stay over at Bruketa's apartment when she fell asleep when they were working on their business plans. Bruketa reported he dated at different times three women from November 1989 to March 1990 with whom he had a sexual and romantic relationship. Bruketa stated he did not pay petitioner's rent or utilities. He drove petitioner's car for her because she was unfamiliar with the area and because petitioner had a sleep disorder. Bruketa stated petitioner was not a signer on his checking account, she did not pay his rent or phone bill, and did not buy food for him. None of petitioner's personal belongings were moved into Bruketa's apartment. Bruketa never exchanged gifts with petitioner or bought anything for petitioner.

Bruketa did not recall Brown's question to petitioner about how it was to live in his apartment complex. According to Bruketa, the registration tags for his vehicle were current. Bruketa explained petitioner put a message on his telephone because she used a spare bedroom in his apartment for her business. Bruketa and petitioner ate out together occasionally but each paid for his or her meal. Bruketa gave petitioner a key to his apartment in the event he was not home when she received business customers. Bruketa stated the business plan with petitioner was abandoned in mid-March 1990 because there were no good prospects, but petitioner continued to use his address and phone number on her checks.

Petitioner moved to a new address in Gulf Breeze in mid-July 1990, before the hearing on the motion to terminate, and took all of her belongings from King's address and the storage area. In a deposition, the maintenance man from Bruketa's apartment denied telling respondent's private investigator that petitioner and respondent lived together or that Bruketa moved some of petitioner's belongings into his apartment in June 1989.

The trial court granted respondent's motion to terminate maintenance, finding the testimony of petitioner and Bruketa substantially incredible. Specifically, the trial court found the evidence established petitioner and/or her car were frequently seen at Bruketa's apartment, the two shopped together and displayed some affection for each other, and petitioner used Bruketa's address on her bank account. In the order, the trial judge also stated: "[I]t is incredible to believe [petitioner] was able to live on *** $300.00 [ ] a month or less."

Petitioner argues the trial court abused its discretion in terminating maintenance payments. Specifically, petitioner argues the trial court failed to properly consider those factors recognized as determinative of whether petitioner was cohabiting with Bruketa and gave too much weight to Brown's testimony. Petitioner also contends the trial court's decision was not based on the evidence but on speculation.

■■■ Section 510(c) of the Act dictates that the obligation to pay future maintenance is terminated "if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." (Ill. Rev. Stat. 1989, ch. 40, par. 510(c).) A "conjugal" relationship is a husband-and-wife-like relationship which does not necessarily involve a sexual component. (*In re Marriage of Sappington* (1985), 106 Ill. 2d 456, 478 N.E.2d 376.) In considering whether to terminate maintenance under section 510(c), the *Sappington* court noted:

" '[A]n important consideration, divorced from the morality of conduct, is whether the cohabitation has materially affected the recipient spouse's need for support because she either received support from her co-resident or used maintenance monies to support him.' " (*Sappington*, 106 Ill. 2d at 467-68, 478 N.E.2d at 381, quoting *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 663, 404 N.E.2d 469, 473.)

The burden of establishing a *de facto* husband and wife relationship rests with the spouse seeking to terminate maintenance. (*In re Marriage of Reeder* (1986), 145 Ill. App. 3d 1013, 1018, 495 N.E.2d 1383, 1386.) Each case for termination of maintenance must rest on its own facts, given the unique nature of personal relationships. (*Sappington*, 106 Ill. 2d at 466, 478 N.E.2d at 380.) The trial court's decision to terminate maintenance will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *Reeder*, 145 Ill. App. 3d at 1021, 495 N.E.2d at 1386.

■■ In this case, the evidence was contradictory. The testimony of petitioner and Bruketa that they did not have a continuing conjugal relationship was uncorroborated and deemed incredible by the trial judge. It was for the trial judge to evaluate the credibility of witnesses and determine the weight accorded contradictory testimony and his findings are presumed to be correct. (*Andrea Dumon, Inc. v. Pittway Corp.* (1982), 110 Ill. App. 3d 481, 489, 442 N.E.2d 574, 578.) On review, those findings will only be reversed where they are clearly erroneous. *State of Minnesota ex rel. Gulley v. Caldwell* (1990), 198 Ill. App. 3d 91, 97, 555 N.E.2d 752, 755.

■■ We accept the credibility determination made by the trial judge. Nevertheless, we conclude the evidence did not establish a continuing conjugal relationship between petitioner and Bruketa. The evidence presented by Brown established that (1) petitioner liked living at Bruketa's apartment; (2) petitioner and Bruketa behaved affectionately toward one another in public; and (3) Bruketa admitted to a third person that he would be moving his "girl friend's" belongings into his apartment in June 1989. Brown's contact with petitioner and Bruketa was very limited. Moreover, we do not find his testimony, standing alone, established petitioner and Bruketa had a *de facto* husband and wife relationship. The fact that petitioner stayed at Bruketa's apartment occasionally does not establish she was a resident in Bruketa's household (*Schoenhard v. Schoenhard* (1979), 74 Ill. App. 3d 296, 301, 392 N.E.2d 764, 768) and automatically justify termination of maintenance. (*Reeder*, 145 Ill. App. 3d at 1018, 495 N.E.2d at 1386.) At most, the evidence may support a dating relationship. See

*Rosche v. Rosche* (1987), 163 Ill. App. 3d 308, 516 N.E.2d 1001 (taking trips together in car and staying at apartment overnight implied a dating relationship).

In *Schoenhard,* the testimony showed that the plaintiff lived with a man approximately 50% of the time, that she had no apartment of her own and lived the other 50% of the time with her parents; when she stayed with the man, she did the cooking, cleaning and caring for his children and also had sexual relations with him. She also testified that any money given to her by the man was only in the form of a loan and she was required to pay it back; she continued to use her name of Schoenhard; and she also paid her own bills. The *Schoenhard* court upheld the trial court's determination not to terminate alimony. In *Bramson,* Mrs. Bramson testified that she lived on a part-time basis in the residence of another man. She lived there until, at the time of receiving the petition to terminate maintenance, she moved to the apartment of a female friend. She testified that while she lived with the man, they shared the same bed; the man would also sleep over from time to time when she lived at the marital home during August 1977; after moving out of the man's apartment, Mrs. Bramson returned to stay overnight about 20 times; and they had taken trips together, but the testimony was that both persons had also dated other people. They shared expenses, she paid for most of the food, shared the expense of a housekeeper, paid $100 to $150 per month for housing, and paid a plumbing bill when she caused some damage. With the exception of holiday gifts, she bought her own clothes. She considered herself to be sharing expenses as with any roommate. She did most of the cooking and the man handled most repairs. When her children visited her at the man's apartment, Mrs. Bramson provided their food, bus tokens, and paid entertainment expenses. Mrs. Bramson testified she moved in with the man in part because his home was large enough for comfortable visitation with the children. She also put her own name on the man's door and never went by or used the name of the man. The court in *Bramson* terminated alimony and, on appeal, the reviewing court reversed, stating:

> "[T]he legislature apparently believed a supporting spouse should be relieved of maintenance obligations if the former spouse has, in fact, entered into a relationship which amounts to that of husband and wife." (Emphasis omitted.) *Bramson,* 83 Ill. App. 3d at 662, 404 N.E.2d at 472.

Here, there is no evidence in this case of a sexual relationship, no evidence of sharing expenses, no evidence of Bruketa paying any of respondent's expenses. We note that other cases have given credence

to the fact that the receiving spouse moved out of the residence of the paramour after the petition for termination of maintenance has been filed. This should be given little credence by the trial court, but it is evidence of the tentative nature of the relationship. See *In re Marriage of Clark* (1983), 111 Ill. App. 3d 960, 444 N.E.2d 1369 (termination of cohabitation before hearing evidence relationship was not a continuing one).

In summary, on review of the appellate court cases in Illinois and the supreme court's decision in *Sappington*, the evidence here is not sufficient to justify the trial court's determination that maintenance should be terminated.

For the foregoing reasons, the order of the trial court is reversed.

Reversed.

LUND, P.J., and SPITZ, J., concur.