*In re* MARRIAGE OF SHERYL JOHNSON, Petitioner-Appellee, and LARRY JOHNSON, Respondent-Appellant.

Fourth District   No. 4—92—0749

Argued April 13, 1993.—Opinion filed June 10, 1993.

COOK, J., dissenting.

Steven Nardulli (argued), of Stratton, Dobbs & Nardulli, of Springfield, for appellant.

James E. Elmore, (argued), of Elmore & Reid, of Springfield, for appellee.

JUSTICE LUND delivered the opinion of the court:

This appeal is from an August 27, 1992, order of the circuit court of Logan County denying respondent Larry Johnson's petition to modify maintenance payments. While this domestic proceeding has previously been before this court (*In re Marriage of Johnson* (1991), 215 Ill. App. 3d 174, 574 N.E.2d 855), we now review only evidence relevant to the current petition to modify. To modify maintenance, Larry must show a substantial change in circumstances. Ill. Rev. Stat. 1991, ch. 40, par. 510(a).

The marriage of respondent and petitioner Sheryl Johnson was dissolved in November 1989. Each received a half of what was at that time perceived to be a net worth of approximately $210,000. Sheryl's $105,000 share was basically investments and a $55,000 12-year mort-

gage with 6% interest which called for monthly payments of $533.78 and encumbering the real estate received by Larry. She was awarded permanent maintenance of $500 per month. Larry received the only real estate, a 12-acre tract east of Lincoln, improved with a family residence and farm buildings used in a hog-raising operation. He also received all equipment used in the operation, but assumed all debts of the parties plus Sheryl's $55,000 second mortgage which, at the time of hearing, had been paid down to $48,000.

While Larry blames his current economic problems on a January 1991 disease resulting in the death of 260 to 265 pigs, the undercapitalization which resulted from the dissolution may be the more likely culprit.

Larry remarried and now lives with his present wife and three stepchildren in the residence on the 12 acres. The present wife has some income which is now supporting her, the children, and, in part, Larry. Larry has been a pork producer since 1964. He did do carpentry work for a total of five or six years, all prior to 1982. He has only a high school education.

In late winter of 1991 and spring of 1992, Production Credit Association (PCA), his major source of financing, determined to cut off financing. By that time, the pig loss in early 1991 had shown up in substantially lower hog sales. By the end of May 1992, PCA had notified all those buying pigs from Larry that PCA was exercising its security agreements and that all checks for livestock purchases were to be made payable to PCA and Larry.

We must recognize in this case that evidence of farm income has no relevance in determining present and future income. A livestock operation cannot be operated without sufficient capitalization or adequate credit—Larry has neither.

Counsel for Sheryl, in suggesting Larry has financial ability, placed emphasis on the 1990 construction of a $50,000 shed by Larry. PCA provided financing for this shed. The debt, then approximately $55,000 to $57,000, was paid off in March 1992 with funds from liquidation of hogs. There was evidence that the value of market livestock and breeding livestock in January 1992 was $92,000. The liquidation to pay the $55,000 to $57,000 would have substantially reduced the value but because feeding was still continuing, inventory value would increase—being decreased only by subsequent sales.

By May 1992, PCA was advancing funds only to pay for feed for the existing livestock. All credit from suppliers had been cut off. The approximate asset and liability picture at the time of the May 15, 1992, hearing was as follows:

## ASSETS

| | | |
|---|---|---|
| 12 acres with house and farm buildings | | $174,000 |
| Personal items, household goods, *et cetera* | | 19,000 |
| Machinery and vehicles | | 29,000 |
| Livestock | | 54,000 |
| | Total | $276,000 |

## LIABILITIES

| | | |
|---|---|---|
| Farm Credit Service—farm mortgage | | $ 82,000 |
| PCA—two loans secured by livestock or machinery | | 54,000 |
| Magna Bank—lien on 1988 Chevrolet Blazer | | 5,000 |
| Sheryl Johnson—judgment | | 11,000 |
| Sheryl Johnson—second mortgage on 12 acres | | 48,000 |
| Unsecured claims of various creditors | | 38,000 |
| | Total | $238,000 |

| | |
|---|---|
| Assets | $276,000 |
| Liabilities | -238,000 |
| Balance | $ 38,000 |

More important than what *appears* to be the net worth is the absence of credit. PCA, the major creditor, determined that the operation would not "cash flow," and this was without considering the $6,000-per-year maintenance payment. Larry could not buy pigs or feed, thus was unable to make income from the hog operation. This situation is typical of many undercapitalized farm operations which have gone by the wayside in the last 10 years.

Sheryl argues Larry can work as a carpenter or can run the hog operation for someone else. Larry testified that he last did carpentry work in 1981. He stated he had recently sought employment as a carpenter, but no such work was presently available. While he testified the hourly rate would be $8 per hour, when asked if any work was available he said, "Not yet. I'm waiting." Farm labor hourly rates were "[f]ive to six dollars if they're lucky." To conclude that Larry will have sufficient income to pay maintenance, regardless of the serious financial reversal, is pure speculation.

Testimony as to the feeding operation established that Larry cannot, because of lack of collateral and credit, restart the business. The evi-

dence of someone hiring him to run the operation is scanty and, in any case, would not free Larry from the responsibilities of maintaining the buildings and paying the mortgages.

What we have here is an unemployed, ex-pork-producing farmer faced with paying interest payments, unpaid farm bills, and maintenance. With no funds available to make payments, unpaid interest will result in constantly increasing indebtedness, as will the unpaid maintenance. There probably is only one way out—to liquidate as quickly as possible, hopefully paying off all debts. This solution also presents problems. The sale of farms, real estate, and equipment can result in depreciation recapture, thereby creating taxable income and taxable capital gains. (See 26 U.S.C. §1245 (1988).) This taxable income does not create additional value, only additional Federal income tax. This may well be a situation where an insolvent taxpayer owes tax, while having no funds available to pay the tax.

Another problem with erroneously denying modification is that maintenance cannot be discharged in bankruptcy. (*In re Marriage of Porter* (1992), 229 Ill. App. 3d 697, 699, 593 N.E.2d 1138, 1139; 11 U.S.C. §523(a)(5) (1988).) You have a man here without income and, by now, 12 months after May 1, 1992, probably without a net worth. You have the maintenance obligation increasing because funds are not available to make payments. Maintenance must be abated retroactive to the filing of Larry's petition. Any other decision threatens to condemn Larry to lifelong insolvency. A substantial change in circumstances has been shown, and the case should be reversed and remanded with directions to enter an order to *abate* maintenance retroactive to filing of the petition to modify.

Our holding that the trial court's decision was contrary to the manifest weight of the evidence is based upon the evidence actually presented to the trial court and the required conclusions therefrom. If there is a substantial change in Larry's financial status in the future, such as a lucrative lease arrangement of the farm assets or in the nature of substantial employment, then Sheryl shall be able to seek restoration of maintenance benefits. See Ill. Rev. Stat. 1991, ch. 40, par. 510(a).

Reversed and remanded with directions.

STEIGMANN, P.J., concurs.

JUSTICE COOK, dissenting:

I respectfully dissent. I agree with the proposition that in maintenance cases, as in child-support cases, "The Act is geared towards a

present ability to pay support and does not suggest in its terms that possible future financial resources of a party may also be taken into account." (*Coons v. Wilder* (1981), 93 Ill. App. 3d 127, 134, 416 N.E.2d 785, 792 (child support); see also *In re Marriage of Moore* (1983), 117 Ill. App. 3d 206, 209, 453 N.E.2d 102, 105 (child support).) Maintenance should generally be based on the financial situation which exists on the date of trial; anticipated increases in income or expenses may be dealt with as they occur, in subsequent orders.

There are limits to this general rule. When a payor of maintenance has income which fluctuates, such as farm income, it would be ridiculous to allow the payor to abate maintenance during a month when he has no income, then require the payee to petition to reinstate maintenance the next month. Likewise, where the payor has left one job and is about to begin another it makes no sense to abate maintenance based on lack of income during the interim. A court need not limit itself to an award based on current income when that income is unusually low, or where the payor is likely to receive a bonus later in the year. *In re Marriage of Butler* (1982), 106 Ill. App. 3d 831, 838, 436 N.E.2d 561, 565 (court gave no weight to recent decline in earnings); *In re Marriage of Reyna* (1979), 78 Ill. App. 3d 1010, 1014, 398 N.E.2d 641, 645 (court considered past income, although it was uncertain whether it would continue); *In re Marriage of Garelick* (1988), 168 Ill. App. 3d 321, 327, 522 N.E.2d 738, 742 (court considered payor might receive a bonus).

I would be willing to consider any evidence that Larry's current no-income status is reasonably expected to continue, or that Larry's anticipated income is less than what he experienced in the past. Larry, however, offered no testimony that he would be without work for a substantial period of time. The evidence showed that Larry was ready to enter into a new hog operation, or do carpenter work, or perhaps both. Larry did offer testimony as to his anticipated income, but that testimony was inadequate. The party seeking modification of a maintenance order bears the burden of persuading the trial court that a change in maintenance is justified. (*In re Marriage of Logston* (1984), 103 Ill. 2d 266, 287, 469 N.E.2d 167, 176; *In re Marriage of Lenkner* (1993), 241 Ill. App. 3d 15, 19, 608 N.E.2d 897, 900.) The majority's focus on the interim between jobs improperly reverses the burden of proof, imposing upon Sheryl the obligation to prove Larry's income in order to restore maintenance benefits at a later date. The burden instead should be on Larry to seek a reduction in maintenance when the evidence is available to show that a reduced level of maintenance would be proper.

The majority opinion states it is improper to look beyond Larry's current no-income period, but then indicates that Larry will not be able,

because of lack of collateral and credit, to restart his business. This court may know better than the trial court, or even Larry, what it takes to operate a hog business, but that knowledge should not excuse Larry's failure to present evidence. A showing that some significant misfortune has taken place does not always mean maintenance will be terminated; reduced income may warrant reduced maintenance, and it was Larry's burden to present evidence establishing an appropriate level. (*In re Marriage of Krupp* (1990), 207 Ill. App. 3d 779, 790-91, 566 N.E.2d 429, 436 (showing of substantial change in circumstances does not shift burden to payee to establish right to maintenance).) Larry did attempt to show what his anticipated income would be, but his evidence was very weak (the majority describes it as "scanty"). (245 Ill. App. 3d at 819.) The majority opinion actually is more persuasive than the evidence presented, sets out the facts much more clearly than Larry did, and resolves some conflicts in his testimony.

The most important testimony in this case concerned Larry's anticipated income. At the May 15, 1992, hearing Larry testified he had been contacted by approximately eight people about the possibility of leasing or renting his facilities. He was interested in a farrow-to-finish operation which would include all phases: breeding, farrowing, and finishing. Compensation would not be sensitive to hog prices, but would be based on the number of hogs put through the operation. Larry would provide buildings, utilities, repairs, taxes, insurance on buildings, and "the labor, if that's the avenue you chose. Not all of them [the potential leasing arrangements] would be labor involved." The lessee would provide hogs, feed, medications, vet service up to a point, and insurance on the hogs if desired. In his financial affidavit (filed as an exhibit) Larry estimated his monthly payments on notes, mortgage, taxes, and utilities would be $2,837.83. He multiplied that figure by 12 to come up with $34,053.96, and concluded:

> "The annualized cost of operating the hog operation for someone else on a lease at that time becomes $34,053.96 per year. Even if I earn $4,000 gross per month on the working lease my pre-tax annualized earnings will be under $14,000.00 per year."

The only testimony regarding expected income was this:

> "Q. [By respondent's attorney:] What do you hope to be able—hope to be able to obtain in a gross payment before expenses on a lease situation based upon the capacity of your hog operation?
>
> A. [By Larry:] Well, I have to have enough to cover the expenses that are listed there yearly plus some living expense for myself. That would have to be 34 thousand annually."

The best answer Larry could give, when his attorney asked what his income would be, was that he would have to have enough to cover his debts "plus some living expense for myself." What Larry has to have provides no clue what the operation might actually produce. Larry testified he would receive a set amount for each hog, but did not testify what that amount was. There was no testimony how many hogs could be raised each month. There was no testimony what amount of expenses might be saved in a hog operation lease. It is interesting that Larry does not propose to liquidate his hog operation, as the majority suggests he should, but believes that he can continue in one form or another. It is also interesting that Larry constructed the $50,000 hog building in late 1990, and paid for that building within two years by two Farm Credit intermediate loans which were paid off through liquidation of his hogs. Rapid payment of long-term debt can distort an individual's ability to pay his debts as they become due. Larry testified he was unable to get additional financing through Farm Credit, but the only other place where he sought credit was Magna Bank, and he had not heard back from them.

It was Larry's petition and Larry's burden of proof, and based on the evidence presented and the standard of review, the trial court did not abuse its discretion in denying the petition to modify maintenance. I would affirm the decision of the trial court.