# Illinois Official Reports

## Appellate Court

---

*In re Marriage of Folley*, 2021 IL App (3d) 180427

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF ANNE E.L. FOLLEY, Petitioner-Appellant, and GREGORY S. FOLLEY, Respondent-Appellee. |
| District & No. | Third District<br>No. 3-18-0427 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | May 4, 2021<br><br>May 19, 2021<br>May 19, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 10-D-643; the Hon. Kim L. Kelley, Judge, presiding. |
| Judgment | Order vacated; cause remanded. |
| Counsel on Appeal | Richard W. Zuckerman, of Peoria, for appellant.<br><br>David M. Lynch, of Lynch and Bloom, PC., of Peoria, for appellee. |
| Panel | JUSTICE DAUGHERITY delivered the judgment of the court, with opinion.<br>Presiding Justice McDade and Justice Lytton concurred in the judgment and opinion. |

**OPINION**

¶ 1    The parties, Anne E.L. Folley (Anne) and Gregory S. Folley (Greg), divorced after 28 years of marriage. Under the parties' Marital Settlement Agreement (MSA), among other things, Greg was obligated to pay Anne maintenance in the amount of $20,000 per month. Five years later, after being forced to retire early by his employer, Caterpillar, Inc., Greg filed a petition to terminate or modify maintenance and terminate or reduce his obligation to maintain $3.3 million worth of life insurance for the benefit of Anne. The trial court found that Greg's early retirement was a substantial change in circumstances and reduced Greg's maintenance obligation to $0, with Anne allowed to file a motion to review maintenance upon Greg obtaining reemployment and with Greg ordered to continue to seek reemployment in good faith. The trial court also reduced Greg's obligation to maintain life insurance for the benefit of Anne from $3.3 million to $500,000. Anne appealed, arguing that the trial court abused its discretion by reducing Greg's maintenance payments to $0 until further order of the court and by reducing Greg's life insurance obligation. We vacate the trial court's order and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3    Greg and Anne were married on August 13, 1983. During their marriage, the parties had nine children. For the duration of the marriage, as agreed to by the parties, Anne cared for the children while Greg worked outside of the home. In April 2010, the parties separated. On June 29, 2012, a judgment of dissolution of marriage was entered, which incorporated the parties' MSA.

¶ 4    At the time of the parties' dissolution of marriage, Greg was employed as a vice president with Caterpillar, Inc., earning a base monthly gross income of $38,880 plus additional short-term incentive pay (paid annually) of approximately $66,451.50 per month. Pursuant to their MSA, the parties equally divided their marital estate that was worth approximately $5 million. As part of their property division, Greg took sole ownership of the parties' marital home in Peoria, Illinois (valued at $550,000 with a $576,000 mortgage), and Anne took sole ownership of their second home in Peru, New York, which had been purchased during the dissolution proceedings in 2011 (valued at $309,000 with a $245,000 mortgage). The property division also included the equal division of the parties' checking, savings, and investment accounts (total approximate value of $1,365,155), as well as an equal division of Greg's retirement benefits—a pension plan, a supplemental pension plan, 401(k) ($1,449,386), individual retirement account (IRA) ($287,946), and Caterpillar stock options (valued at $604,464). The parties also had college savings plans for the children valued at $881,000, which they agreed to continue to maintain for the benefit of the children.

¶ 5    In 2012, at the time of the dissolution judgment, four of the parties' nine children were still minors. Under the MSA, Anne was to receive unallocated maintenance from which she was obligated to pay for the expenses of the minors living with her.[1] Greg was to pay Anne $20,000

_____

[1]The record is not clear as to how many of the minors lived with Anne at the time the dissolution judgment was entered in 2012, which incorporated the parties' unallocated maintenance agreement pursuant to the MSA. In his affidavit of December 5, 2011, Greg indicated that the two older minors (ages 16 and 17) lived with him. Therefore, presumably, the parties two youngest children (ages 9 and

- 2 -

per month in "permanent maintenance" and 25% of any short-term incentive payments (STIP). There was no separate child support allotted under the parties' MSA. The terms of the MSA indicated that Greg's obligation to pay, and Anne's right to receive, the maintenance payments agreed to by the parties "shall terminate" upon the first to occur: the death of Greg; the death of Anne; the remarriage of Anne; or "the cohabitation of [Anne] on a resident, continuing, conjugal basis." Additionally, under the MSA, Greg was also required to maintain health insurance for the benefit of the parties' children, with the parties' splitting any expenses not covered by insurance. Greg was also required to maintain $3.3 million in life insurance for the benefit of Anne for the duration of his maintenance obligation.

¶ 6        On July 14, 2017, Greg filed a petition to modify his maintenance obligation, his obligation to maintain life insurance for the benefit of Anne, and his obligation regarding the children's health insurance.On November 13, 2017, a hearing took place on Greg's petition.

¶ 7        At the hearing on November 13, 2017, Greg testified that he had worked at Caterpillar from August l, 1995, until his retirement on July 3l, 2017, and had been a vice president for the company since 2009. He earned over $2 million per year. On June 15, 2017, Greg had been given the option of retiring or being terminated due to restructuring within the company. At that time, Greg was 58 years old and had intended to continue to work until at least the age of 62, which was the age he would have received full retirement benefits at an unreduced rate. Upon being told he would no longer be employed with Caterpillar, Greg chose to retire, with his retirement becoming effective on July 31, 2017. Greg testified that he received his regular pay through July 31, 2017. He also received a gross severance payment of $1.16 million (net $657,159.78). He would also be receiving a *pro rata* STIP payment in March 2018 for 2017, of which Anne would receive 25% pursuant to the MSA.

¶ 8        At the time of filing his financial affidavit in October 2017, Greg had approximately $12 million worth of assets in various checking, savings, investment, and retirement accounts, which included 169,972 shares of Caterpillar stock with a fair market value of $7.3 million. At the hearing, Greg testified that a few weeks prior he had exercised about 70,000 of his Caterpillar stock options and received a net payout of approximately $1.9 million (after paying approximately 40% in taxes). He also testified that upon retiring he received a gross payout of $325,000 ($228,000 net) from a supplemental savings account.

¶ 9        Greg testified that if he had retired at the full retirement age of 62, his monthly pension benefits would have been $34,366.76 per month, but that amount was reduced to $28,981.49 due to his early retirement. After an offset for the portion of the pension payments to be paid to Anne (approximately $11,000), Greg could have received pension payments of $17,852.60 per month under a single life annuity option but opted for reduced pension payments of $16,233.37 per month during his lifetime (under the 50% joint and survivorship option) so that his current wife, Margo, could receive payments of $8115.69 per month after his death.

¶ 10       According to Greg's 2017 financial affidavit, Greg's gross retirement income was anticipated to be $23,500 per month (monthly pension benefits of $16,233, interest and dividend income of $3150, and supplement deferred compensation payments of $3624 per month (to start in February 2018)). Greg indicated on his financial affidavit that his monthly

___

13) lived with Anne at that time. However, following the subsequent modification of maintenance proceeding in 2018, the trial court found that three of the minors were living with Anne at that time.

expenses of approximately $49,719 per month (not including Anne's $20,000 maintenance payments) exceeded his monthly income of $23,500.

¶ 11 Greg lived with his current wife, Margo, to whom he had been married since 2016. She did not contribute to their living expenses. They lived in a home that Greg had purchased in 2014 for $2 million on North Prospect Road in Peoria, Illinois, with Greg still owing $1.6 million on that home. Greg also still owned the parties' marital home, which he was trying to sell. Greg paid almost $23,000 per month in relation to the two homes—$11,648 for the two mortgages, $5031 in property taxes, $1025 for homeowners' insurance, $4000 in necessary repairs and maintenance, $860 for gas, $565 for water and sewer, $290 for cable, and $450 for cleaning services. His other monthly expenses of almost $27,000 were for, among other things, car payments ($2600); entertainment/dining out/hobbies ($4500); donations ($4000); vacations ($3750); and $1880 of "minor and dependent child expenses," which included $1680 per month for "children only" vacations. Greg's monthly car payments were $2598 per month for two leases—one for a 2016 Porsche 911, and one for a Hyundai, with all but $190 being paid for the Porsche. Greg leased the Porsche in August 2016 and could not trade it in for a less expensive vehicle until September 2018.

¶ 12 Additionally, Greg indicated that he was paying for $5.5 million worth of life insurance, with $3.5 million allocated for the benefit of Anne. Greg indicated that he paid $1891 per month in premiums for term life insurance and $735 per month for whole life insurance, although he did not specifically indicate how much he paid for the portion of life insurance that was carried for the benefit of Anne.

¶ 13 As for looking for employment, Greg testified that he was seeking reemployment but had yet to be hired. If Greg could find a "suitable job," he would like to work. He had been looking for full-time work and had a couple of "significant" leads, but those leads concluded at the "headhunter stage." Greg indicated he had four telephone interviews with Amazon and anticipated having an in-person meeting, possibly at the end of January 2018.

¶ 14 Anne testified that she was 56 years old. According to her affidavit filed in October 2017, Anne had total assets of approximately $5.5 million, consisting of $4.25 million in various checking, savings, and investment accounts, a 401(k) retirement account of $477,160, two vehicles (valued at $48,000 with no outstanding loans), and a North Carolina home (valued at $695,000). In September 2017, Anne had sold her New York home for $301,500 and purchased the home in North Carolina for $695,000. Anne paid for her North Carolina home after cashing in some stock so she would not have a mortgage payment.

¶ 15 In addition to receiving her portion of the monthly pension payments (approximately $10,500 to $11,000 per month), Anne earned approximately $9600 per month from investment income and dividends, which she reinvested. In her affidavit, Anne indicated that her total monthly living expenses were $18,000 per month. Her monthly expenses included approximately $7000 per month in home expenses—$548 for property taxes; $145 for homeowners' insurance; $1000 in necessary repairs and home maintenance; $610 for utilities, cable, garbage services, and cleaning services; and $5046 for "additional upgrades to house and property." Anne's other monthly expenses included, among other things, groceries ($2000); car payments ($1425), which she testified were her "travel expenses"; entertainment, dining out, and hobbies ($1860); gifts ($2416); vacations ($625); and "travel/lodging for court and house, attorney fees, broker fees" ($650). She also indicated that she paid "minor and dependent children expenses" (presumably for the parties' minor 14-year-old daughter) in the

amount of $617 per month. Anne explained that she had estimated that she spent almost $2500 per month on gifts in the past year as the result of spending $15,000 to help one of the parties' sons, spending $5000 on their other son who had gotten married, and giving other gifts "out to the kids." She also spent approximately $6000 per month on home improvements in preparing to sell her New York home, and she anticipated having extensive home improvement costs for her new home.

¶ 16    Anne testified that if her maintenance payments were terminated, she would have to spend her savings or sell stock. Anne also testified that she had paid for her expenses from her maintenance payments and had never taken money from her investments or investment income to pay bills (except for the purchase of her North Carolina home).

¶ 17    On November 17, 2017, the trial court issued a memorandum of its decision. The trial court found: under the MSA, Greg's maintenance obligation to Anne was $20,000 per month (commencing on June 30, 2012), plus 25% of any STIP pay he received; there was no separate child support provision under the MSA because the children's expenses were to be paid from the spousal maintenance payments; at the time of the dissolution of marriage in 2012, the parties had three minor children in Anne's care, but there was currently only one minor child in her care; at the time of the dissolution, qualified domestic relations orders (QDROs) were entered, which equally divided Greg's retirement and deferred compensation plans between the parties; at the time of the parties' MSA, Greg had base gross income of $38,380 per month plus significant additional short-term and long-term incentive pay; on July 1, 2017, defendant opted to retire as the result of being forced to choose between retiring or being terminated without apparent cause and, as such, constituted a good faith change in circumstance; pursuant to the severance package Greg had negotiated with Caterpillar, Greg received gross severance pay of $1,161,000 (net of $657,159.58); the parties "have enjoyed and continue to enjoy [a] luxurious life style within the proverbial one percent of top wage earner"; the parties' financial affidavits each had " 'fat' " in their budgets in regard to overstatements of current expenses (with the court noting, for example, Anne's house repair expenses for her sold home and car payment expense, which was actually $0) and discretionary expenses that were "clearly non-essential and could easily be reduced" (with the trial court noting, for example, Greg's donations, entertainment, and vacations); Greg was to receive pension payments of $16,233 per month; and Anne was to receive pension payments between $10,500 and $11,000.

¶ 18    The trial court further found Greg's decision to retire was "forced by Caterpillar Inc and [was] in no way to avoid his obligation to his former spouse or [his] children" and constituted "a substantial change in circumstances which warrant[ed] a reduction in maintenance, but for [Greg's] severance package." The trial court found there had not been any change in circumstances at that time, though, because Greg was receiving his full wages plus benefits for at least 30 additional weeks as the result of his severance pay. The trial court found Greg would not be eligible for a reduction of maintenance until March 5, 2018, denied Greg's request for a reduction in maintenance, and indicated it would review the matter after March 5, 2018. In the meantime, Greg was ordered to continue his job search, report any job offers to Anne's attorney, and provide verification of his compensation upon reemployment.

¶ 19    On March 12, 2018, a hearing for a review of maintenance took place. According to his affidavit filed on March 2, 2018, Greg had approximately $12 million worth of assets. Greg's current gross monthly income was approximately $23,683.62 per month ($16,233.37 from his pension and $7450.25 in interest and dividend income; there was no reference to the

supplement deferred compensation pay of $3624 per month previously listed as income to start in February 2018 on his 2017 affidavit).

¶ 20    Greg testified as to his continued efforts to find employment. Greg indicated that younger colleagues with similar backgrounds and experience were having more success at securing employment. Greg was also prohibited from working for a competitor of Caterpillar under a noncompete agreement, which would expire in July 2018. Greg had been screened by headhunters for some jobs but did not pass beyond the screening process. Greg had interviewed for a law professor job for a salary of between $125,000 to $150,000 and was waiting to hear back. He was unable to secure any other job interviews.

¶ 21    Since the prior hearing, Greg sold the parties' marital home for $361,000 (the mortgage was "just under" $500,000 at the time of the sale). He was also trying to sell his home on North Prospect for $2.1 million, on which he owed approximately $1.6 million. On or around January 23, 2018, Greg purchased a condominium in Florida (condo) for $3,050,000, paying for the condo outright with no outstanding loans.

¶ 22    As for his expenses, Greg's 2018 financial affidavit indicated living expenses of $47,455.18 (without the additional $20,000 paid in maintenance). Greg's "monthly household expenses" of approximately $22,522 per month (a $3588 decrease from the prior affidavit) included: $4765.18 for the mortgage on the North Prospect home (decrease in mortgage payments of $6883 after selling the marital home); $5916 for property taxes ($900 increase presumably due to the purchase of the condo); $1667 for condo association dues ($1667 increase); $1257 for homeowners insurance ($222 increase); $1200 for gas ($340 increase); $290 for cable (no change); $565 for water and sewer (no change); $850 for house cleaning services ($400 increase); and $4000 for necessary repairs and maintenance (no change). Greg's other monthly expenses did not change from his 2017 affidavit, except as follows: $3018 for car payments ($420 increase after the prior lease on the Hyundai ran out and he began leasing a new Kia); $505 for auto insurance, license, and city stickers ($87 increase); $2500 for entertainment, dining out, and hobbies ($2000 decrease); $2000 in donations ($2000 decrease); $3750 for vacations ($1750 decrease); and $1500 in professional fees and association dues ($670 increase). Greg additionally indicated spending $6280 in "minor and dependent child expenses" per month (a $4400 increase), which included Greg paying $1000 for transportation and $2000 for rent and food for the parties' 25-year-old daughter, Catherine. Catherine's 529 plan had been depleted. Greg anticipated that Catherine would graduate from college in December 2018. Greg also anticipated that he would be assisting the parties' 22-year-old son, who also would be graduating in December, because their son's 529 account was going to be depleted "fairly soon."

¶ 23    Greg had no debt other than the mortgage associated with the North Prospect home. Chase, Greg's stepson (Margo's son), lived in the North Prospect home and did not pay rent. The water and sewer expenses listed on Greg's affidavit were for the North Prospect home, and almost all of the $4000 per month Greg paid in "necessary repairs and maintenance" (listed on his affidavit) was for the North Prospect home. Greg testified that he had actually paid "way more" than $48,000 in repairs and maintenance for the North Prospect home in the last 12 months. He estimated that he would spend about the same amount "going forward." Greg testified that selling the North Prospect home would "substantially" reduce his cost of living.

¶ 24    Anne testified that the parties' minor daughter lived with her. The parties' minor daughter was 15, would turn 18 in August 2020, and would graduate from high school in 2021. In

addition, a few months prior, in December 2017, the parties' 20-year-old daughter moved back into Anne's home.

¶ 25 Anne filed an updated financial affidavit on March 7, 2018. Anne's monthly income (without maintenance) was $20,410.38, which consisted of $10,796.13 in pension payments, $640.83 of interest income, $4024.92 of dividend income, and $4948.50 of investment income. Anne's total monthly expenses were listed as $17,814.73, with no substantial change to her expenses from her prior affidavit filed in 2017, except for a $400 per month increase in groceries and household supplies (presumably due to the parties' 20-year-old daughter moving in with Anne) and the removal of the "car payments" expense previously listed as $1425.83, which Anne had testified at the prior hearing were travel expenses. According to her 2018 affidavit, Anne's total assets had increased to approximately $7.5 million, consisting of various checking, savings, and investment accounts (totaling $6.27 million), a 401(k) account ($557,877), two vehicles (valued at $48,000), and her North Carolina home (valued at $695,000).

¶ 26 Anne testified that when she agreed to permanent maintenance in the amount of $20,000 per month she understood that to mean she would receive that amount until she or Greg died. Anne had graduated from Notre Dame in 1983. She testified that she did not plan to work because she was not qualified for anything above an entry level job and her income "would just get sucked into taxes." She also indicated that she could not do anything physical because she had an arthritic hip.

¶ 27 On March 16, 2018, the trial court entered a memorandum of its decision. The trial court found Greg's severance pay had been exhausted and Greg was, in good faith, continuing to seek re-employment but was unsuccessful "for a variety of reasons, including his age (almost 59)"; although Greg sold one of his two homes (at a loss), he then purchased a $3.1 million home while still owning a $2.1 million home; Greg had "not appreciably improved his monthly cash flow situation in the face of his severance package becoming exhausted," which was a situation "of his own volition"; Anne had extensive liquid assets and income (from her portion of the pension and from investment income and dividends) "from which to meet most of her and the minor child's needs"; statutory maintenance guidelines were not applicable but were "instructive" in that those guidelines would not yield any spousal maintenance because the parties' "regular monthly income [was] relatively equal"; the parties were married over 27 years (at the time of the filing of the dissolution petition), and they had negotiated a full MSA that provided for permanent maintenance; there was no provision in the parties' MSA indicating that maintenance was nonmodifiable; Anne was not anticipated to make efforts to secure employment under the MSA; any income she would be able to secure from employment, "likely entry level minimum wage," would not appreciably meet her reasonable needs; Greg had "extensive talents and business training" and "very marketable job skills," but "the present social economic environment was not favorable for the employment of an older white male in an executive or board of director capacity, making [Greg's] reemployment search more difficult"; Greg "demonstrated by a preponderance of the evidence that a substantial change in circumstances ha[d] occurred which warrant[ed] a modification of the spousal maintenance"; and "maintenance should properly abate, until he obtains employment." The trial court further found that "[i]t would be inequitable to completely terminate maintenance" after over 27 years of marriage and given Greg's potential employability, but "abating the same (*i.e.*, setting

current maintenance payments at zero, with no accumulating arrearage) is proper commencing in the month of March 2018 and thereafter until further order of the court."

¶ 28 Greg was ordered to submit his daily job search history to Anne "on quarterly basis until he obtains employment" and, when reemployed, submit proof of his employment and his compensation package to Anne. Upon Greg submitting proof of his employment and compensation, Anne "shall then have the option to revisit the issue of spousal maintenance upon filing a motion to review the same." The trial court also indicated that Greg similarly had the right to seek termination of maintenance if the circumstances warranted it.

¶ 29 Additionally, the trial court reduced Greg's obligation to provide life insurance for the benefit of Anne to $500,000. The trial court awarded Anne child support for the parties' youngest child in the amount of $1800 per month, from March 2018 through May 2021. The trial court noted that under the statutory guidelines, child support would have been $1157 per month, but it had deviated upward in light of Greg liquidating sizable assets to purchase a second home at $3.1 million (thereby reducing his income), the fact that "his Caterpillar option may and will likely yield greater income," the standard of living the child would have enjoyed if the parties had remained married, and the reasonable needs of the child.

¶ 30 Anne filed a motion to reconsider, requesting that the trial court clarify its order in regard to her 25% portion of Greg's 2017 STIP pay and for specific dates for the abatement of maintenance to begin and for the payment of $1800 per month in child support and for dates for Greg to produce quarterly job search reports. The trial court modified its prior order to clarify that Greg was still obligated to pay Anne 25% of the 2017 STIP payment that he had received in March 2018, the abatement of maintenance was to commence with the March 2018 maintenance payment, child support payments were to commence on March 1, 2018, and Greg was to provide quarterly job reports to Anne on the fifteenth of the month following the end of each quarter.

¶ 31 Anne appealed.

¶ 32 II. ANALYSIS

¶ 33 On appeal, Anne argues the trial court abused its discretion by reducing Greg's maintenance obligation to $0 until further order of the court and reducing Greg's life insurance obligation for her benefit from $3.3 million to $500,000. Anne does not contest the trial court's finding that Greg's forced early retirement constituted a substantial change in circumstances. Rather, Anne argues the trial court abused its discretion by granting the relief that it did in this case—modifying maintenance to $0 while Greg remained unemployed. Specifically, Anne argues that the trial court erred in abating maintenance despite Greg's ability to pay. Anne contends that reducing her maintenance to $0 until further order of the court constituted a *de facto* termination of her permanent maintenance award under the circumstances of this case. Greg argues that the trial court did not abuse its discretion in abating maintenance until further order of the court or by reducing his insurance obligation.

¶ 34 The decision to modify a maintenance award is within the trial court's discretion and will not be disturbed absent an abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24. An abuse of discretion takes place when "the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Id.* Also, a reviewing court will not reverse the court's factual findings unless they are against manifest weight of the evidence. *In re Marriage of*

*Micheli*, 2014 IL App (2d) 121245, ¶ 21. "Findings are against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based upon any of the evidence." *Id.*

¶ 35    Section 510(a-5) of the Illinois Marriage and Dissolution of Marriage Act (Act) provides that an order for maintenance may be modified or terminated "only upon a showing of a substantial change in circumstances." 750 ILCS 5/510(a-5) (West 2016). Where a party has shown a substantial change in circumstances, a court may modify a maintenance award but is not required to do so. *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 204 (2011). After determining that a substantial change in circumstances occurred, a trial court will then consider whether a modification of maintenance is warranted under the factors listed in section 510(a-5) of the Act, as well the factors listed in section 504(a) of the Act. 750 ILCS 5/510(a-5) (West 2016); *Heroy*, 2017 IL 120205, ¶ 25. The movant who is seeking the modification or termination of a maintenance obligation bears the burden of establishing a substantial change in circumstances sufficient to warrant the relief requested. *In re Marriage of Bernay*, 2017 IL App (2d) 160583, ¶ 14; *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 132; *Anderson*, 409 Ill. App. 3d at 198; *In re Marriage of Krupp*, 207 Ill. App. 3d 779, 790 (1990).

¶ 36    In making a determination of whether to modify or terminate maintenance, the trial court is to consider the same factors set forth in section 504(a) of the Act that are to be considered at the time that maintenance is initially awarded, which include (1) the income and property of both parties; (2) the needs of each party; (3) the "realistic" present and future earning capacity of each party; (4) any impairment of the earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage; (5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought; (6) the time required for the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or any parental responsibility arrangements and its effect on the party seeking employment; (7) the standard of living established during the marriage; (8) the duration of the marriage; (9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties; (10) all sources of public and private income (including disability and retirement income); (11) the tax consequences of the property division; (12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse; (13) any valid agreements of the parties; and (14) any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/504(a) (West 2016).

¶ 37    The section 510(a-5) factors that should also be considered when determining whether to modify or terminate maintenance include (1) changes in the employment status of either party and whether the changes were made in good faith; (2) the efforts, if any, made by the party receiving maintenance to become self-supporting and the reasonableness of those efforts; (3) any impairment of the present and future earning capacity of either party; (4) the tax consequences of the maintenance payments; (5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage; (6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage and the present status of the property; (7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or

termination is being sought; (8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage; and (9) any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/510(a-5)(1)-(9) (West 2016).

¶ 38 "Whether a spouse may rely on his retirement as a change in circumstances to justify the modification of maintenance depends on the circumstances of each case." *In re Marriage of Schrimpf*, 293 Ill. App. 3d 246, 251-52 (1997). In determining whether retirement is a change in circumstances sufficient to warrant a modification of maintenance, the relevant factors a court considers include the payor spouse's age, health, and motives, the timing of the retirement, the payor spouse's ability to pay maintenance after retirement, and the former spouse's ability to provide for himself or herself. *Id.* Where a payor spouse has sufficient assets to continue to meet his or her maintenance obligation after retirement, a reduction in income does not, in and of itself, constitute a substantial change in circumstances to support a termination or reduction of maintenance. *Bernay*, 2017 IL App (2d) 160583, ¶ 19 (where the husband had sufficient assets to continue to meet his maintenance obligations after retirement, his decreased income after retirement did not constitute a substantial change in circumstances); *Schrimpf*, 293 Ill. App. 3d at 252-53 (affirming the trial court's denial of husband's request to terminate or reduce maintenance based on his retirement where he had sufficient assets to pay maintenance).

¶ 39 In this case, in determining that abating maintenance was appropriate, the trial court appeared to mainly focus on the fact that Greg's employment status had changed in good faith, which the record shows resulted in a decreased "income" from over $2 million per year down to approximately $280,000 per year. However, the record is also clear that Greg had the ability to pay Anne maintenance where his assets were worth approximately $12 million. Insofar as the trial court found that Greg did not have a present ability to pay maintenance, the finding was against the manifest weight of the evidence. See *Micheli*, 2014 IL App (2d) 121245, ¶ 21.

¶ 40 Although Greg presented evidence that following his retirement his income was substantially reduced and his monthly expenses exceeded his monthly income, that evidence was insufficient to support a reduction in Greg's maintenance obligation to $0 where he had substantial assets from which to pay maintenance. See *Bernay*, 2017 IL App (2d) 160583, ¶ 19. Greg's expenses were not such that he did not have the ability to pay Anne's maintenance where he had assets of approximately $12 million. Greg's only debt was the mortgage on the $2.1 million North Prospect home. In fact, a large portion of Greg's total expenses were related to that home (mortgage payment, property taxes, utilities, house cleaning, etc.), and Greg testified that his financial situation would "substantially" improve upon the sale of that home. Also, Greg could opt to reduce his $2400 per month Porsche lease payment in September 2018.

¶ 41 We also note that Greg's "expenses" included $2000 per month in donations and $3000 per month in support for the parties' adult daughter who would be graduating from college in December 2018. Greg also chose to receive reduced pension payments so that his current wife would receive survivor benefits upon his death. Additionally, Greg cashed out a large portion of his Caterpillar stock options to purchase a $3.1 million condo in Florida prior to selling the $2.1 million North Prospect home and allowed his adult stepson to live in the North Prospect home free of charge. These "expenses" were not evidence of a lack of an ability to pay the maintenance obligation. See *In re Marriage of Kuper*, 2019 IL App (3d) 180094, ¶ 24 ("[a] payor's voluntary acceptance of nonlegal obligations are not to be considered in deciding whether maintenance should be modified or terminated"). As the trial court found, it was of

Greg's "own volition" that Greg's monthly cash flow situation did not appreciably improve in the face of his severance package becoming exhausted. Consequently, the fact that Greg's monthly "expenses" exceeded his monthly income following his retirement was insufficient to support a reduction of his maintenance obligation to $0 where Greg had substantial assets from which to take funds if he had chosen to do so. Moreover, although the trial court found that the parties' "regular monthly income" was "relatively equal," the record shows the trial court considered Anne's earnings from her investments as "income" but did not appear to have equally considered evidence that Greg had an even greater potential earning capacity in that regard where Greg had approximately $5 million more in assets than Anne.

¶ 42    In this case, the trial court specifically found that termination of maintenance would not be appropriate in light of, among other things, Anne's reasonable needs and "the standard of life accomplished during the marriage." "An award of maintenance is generally determined by the needs of the spouse seeking maintenance and the ability of the other spouse to pay, in relation to the standard of living to which they were accustomed during the marriage." *Anderson*, 409 Ill. App. 3d at 209; see also *Shive v. Shive*, 57 Ill. App. 3d 754, 760 (1978). A spouse is entitled to maintain a " 'reasonable approximation of the standard of living established during the marriage.' " *Bernay*, 2017 IL App (2d) 160583, ¶ 17 (quoting *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 833 (1994)).

¶ 43    Here, the record does not contain detailed information regarding the parties' standard of living during the marriage, undoubtedly because the parties had agreed to permanent maintenance in the amount of $20,000 per month under their MSA. Even so, the record is clear that the parties' "standard of living" included their ability to consistently save and invest money and accumulate assets. In its order of November 17, 2017, the trial court specifically found that "[t]he parties have enjoyed and continue to enjoy [a] luxurious life style within the proverbial one percent of top wage earners." The trial court also found that Anne's needs would be "mostly" met by relying on her investment and dividend income rather than Anne being able to reinvest that income as she had always done in the past. However, Anne was not required to lower her standard of living that was established during the marriage where Greg had sufficient assets to meet his needs as well as the needs of Anne. See *Shen*, 2015 IL App (1st) 130733, ¶ 87 (a former spouse is not required to lower his or her standard of living that had been established during the marriage where the payor spouse has sufficient assets to meet his or her needs and the needs of his or her former spouse).

¶ 44    Under the parties' MSA, Greg and Anne had agreed to permanent maintenance of $20,000 per month, and the trial court found that a complete termination of maintenance would be "inequitable" given the length of the parties' marriage and Greg's potential employability. We agree. See *Bernay*, 2017 IL App (2d) 160583, ¶ 21 ("An award of permanent maintenance should not be lightly terminated."). Nonetheless, the trial court abated Greg's maintenance obligation "until he obtains employment," with the trial court essentially reserving its jurisdiction over the maintenance issue until after Greg became reemployed even though Greg had a present ability to pay maintenance. *Cf. In re Marriage of Marriott*, 264 Ill. App. 3d 23, 41 (1994) ("[A] 'reserved jurisdiction' approach to maintenance is appropriate where the responsible party's present ability to pay maintenance is limited."). Upon Greg obtaining employment, Anne would "then" have the option to revisit the issue of spousal maintenance "upon filing a motion to review the same." However, despite Greg's forced early retirement and substantial decrease of income, it is clear from the record that Greg had the present ability

to continue to pay maintenance in some amount and, arguably, the ability to meet his full maintenance obligation of $20,0000 per month as agreed to by the parties under their MSA. See *In re Marriage of Bothe*, 309 Ill. App. 3d 352, 356 (1999) (an award of maintenance must be made on the basis of the circumstances disclosed by the evidence and a trial court should not speculate as to the future condition of the parties in determining maintenance). Based on the evidence presented, we conclude that no reasonable person would have determined that Greg had an inability to pay at least some portion of the permanent maintenance award the parties had agreed to under their MSA. Accordingly, the trial court abused its discretion by reducing Anne's maintenance to $0. See *Heroy*, 2017 IL 120205, ¶ 24.

¶ 45 Additionally, we note that under the trial court's order, the triggering event for Anne to file a motion for a review of maintenance was Greg securing reemployment. The trial court ordered Greg to provide Anne with quarterly employment search reports "until he obtains employment," so that "[w]hen he obtains employment," Anne "shall then" have the option to revisit the issue of spousal maintenance upon filing a motion to do so. The trial court placed no time limitation for review, essentially reserving its jurisdiction over the issue of maintenance indefinitely. As discussed above, the trial court abused its discretion by abating maintenance and reserving its jurisdiction on the issue of maintenance where the record is clear that Greg had the present ability to pay maintenance. See *In re Marriage of Scafuri*, 203 Ill. App. 3d 385, 396 (1990) (the trial court abused its discretion by reserving the issue of the wife's right to maintenance where the husband had the present ability to pay maintenance). The trial court's failure to set a reasonable and certain time for reviewing the maintenance issue was also an abuse of discretion. See *Bothe*, 309 Ill. App. 3d at 357 (although the trial court properly reserved the issue of maintenance, the trial court abused its discretion by doing so indefinitely; the trial court's failure to set a reasonable and certain time for review of the maintenance issue amounted to an abuse of discretion); see *In re Marriage of Wojcik*, 362 Ill. App. 3d 144, 168 (2005) (reserving the issue of the wife's right to maintenance was warranted where the husband was presently unable to pay maintenance, but the trial court abused its discretion by indefinitely reserving jurisdiction over the issue).

¶ 46 Therefore, we vacate the trial court's judgment and remand with directions for the trial court to reexamine its modification of Greg's maintenance obligation in light of Greg's clear ability to pay maintenance and to calculate any arrearages. We also direct the trial court to reexamine its reduction of Greg's insurance obligation where there was no evidence presented as to the portion of insurance premiums paid for Anne's benefit and no evidence presented that Greg could not afford to pay that portion of the insurance premiums.

¶ 47                                  III. CONCLUSION
¶ 48 For the foregoing reasons, we vacate the judgment of the circuit court of Peoria County and remand for further proceedings in accordance with this order.

¶ 49 Order vacated; cause remanded.