**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 230529-U

Order filed April 1, 2025

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| *In re* MARRIAGE OF MARJORIE ZILLIGEN, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | Appeal No. 3-23-0529 Circuit No. 18-D-700 |
| | ) | |
| JON ZILLIGEN, | ) ) | The Honorable Richard D. Felice, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE PETERSON delivered the judgment of the court.
Justices Holdridge and Bertani concurred in the judgment.

**ORDER**

¶ 1    *Held*:  In an appeal in a postdissolution of marriage proceeding, the appellate court found that the trial court did not abuse its discretion in denying the ex-wife's petition to modify maintenance. The appellate court, therefore, affirmed the trial court's judgment.

¶ 2    Petitioner, Marjorie Zilligen, filed a postdissolution of marriage petition to modify maintenance seeking to increase the amount of maintenance that was paid to her each month by her ex-husband, respondent, Jon Zilligen. Jon filed a response and opposed the petition. After

full briefing and an evidentiary hearing on the matter, the trial court denied Marjorie's petition. Marjorie appeals. We affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4        The parties were married in October 1996 and had four children, all of whom are now emancipated. During the marriage, Marjorie maintained the household and took care of the children while Jon pursued his career, although Marjorie did work at times. In April 2018, Marjorie filed a petition for dissolution of marriage. A bench trial was held on the petition, and, in August 2019, the trial court entered a written judgment of dissolution.[1] At the time of the dissolution, Marjorie was 57 years old and Jon was 55 years old. Jon's average annual salary was approximately $191,000 (approximately $221,700 if he received a bonus). The judgment of dissolution provided, among other things, that the parties would split the retirement assets evenly (approximately $472,650 each); that the non-retirement assets would be split with Marjorie receiving a higher percentage with approximately 58% going to Marjorie (approximately $420,200) and approximately 42% going to Jon (approximately $297,420); and that Jon would pay Marjorie indefinite modifiable maintenance of $5500 per month, an amount that exceeded the statutory guidelines amount. The trial court found that the guidelines amount was inadequate for several reasons, including Marjorie's lack of employability and marketable skills and her medical and emotional issues.

¶ 5        In March 2020, Jon filed a petition to modify maintenance seeking to reduce the amount of his monthly maintenance payment to Marjorie. Jon alleged in the petition that a substantial

---

[1]The trial court also issued a letter opinion that was incorporated into, and made part of, the judgment of dissolution. We will refer to both documents collectively in this order as the judgment of dissolution.

change in circumstances had occurred in that his income had been significantly reduced because of the COVID-19 pandemic. He later lost his job.

¶ 6 In May 2021, at a pretrial conference, the parties reached an oral agreement to settle nearly all of the pending matters, including Jon's petition to modify, and communicated that agreement to the trial court. The case was continued so that the parties could put their settlement agreement into writing. The parties were unable to do so, however, and Jon filed a motion to enforce the oral settlement agreement that the parties had reached.

¶ 7 In July 2021, a hearing was held on Jon's motion to enforce. After considering the evidence presented, the trial court entered an order that essentially incorporated the terms of the parties' oral settlement agreement. Among other things, the order provided that: (1) Jon's maintenance payment was reduced to $2750 per month due to the substantial change in Jon's economic circumstances and based upon Jon's reduced income (from unemployment benefits and part-time, hourly employment); (2) Jon was required to maintain a diligent job search and to notify Marjorie immediately if he obtained full-time, or further part-time, employment; (3) Marjorie was to pay Jon $126,000 for Jon's interest in the marital home; (4) Marjorie was also required to pay Jon $15,500 to reimburse Jon for maintenance payments that he had already made; and (5) all pending petitions and motions were withdrawn with prejudice (except a petition relating to college costs).

¶ 8 Less than a week after the July 2021 order was entered, Jon obtained full-time employment in the field in which he had previously worked, human resources (HR), at a pay rate of approximately $114,000 per year, not including overtime compensation. Jon promptly notified Marjorie of his new employment.

3

¶ 9    Later that same month (July 2021), Marjorie filed a petition to modify maintenance and sought to increase the amount of monthly maintenance that Jon was required to pay. Marjorie alleged in the petition that a substantial change in circumstances had occurred from the time of the July 2021 order in that: (1) Jon had obtained the full-time employment described above, and (2) Marjorie had recently paid Jon $141,500 ($126,000 for Jon's interest in the marital home and $15,500 for the reimbursement of maintenance) and had less of an ability to support herself. Jon filed a response and opposed the petition, and Marjorie filed a reply.

¶ 10    In March 2022, the trial court held an evidentiary hearing on the petition. The evidence presented at the hearing, which consisted of the testimony of the parties and numerous exhibits, can be summarized as follows. Jon, who was then 58 years old, testified that at the time of the prior bench trial and when the judgment of dissolution was entered, he was working for Encore Event Technologies (Encore) as the Senior Vice President of HR and Administration. Jon had worked for Encore or a related company since approximately 2004. When the dissolution occurred, Jon's annual base pay at Encore was approximately $195,000. He also received a discretionary bonus each year equal to or about 20% to 30% of his base pay.

¶ 11    At the end of 2019, Encore was bought out by another company (the new company). In April 2020, after the COVID-19 pandemic had started and everything was shut down, the new company instituted layoffs and pay reductions, and Jon's base pay was reduced by 20%. As a result, Jon filed a petition to modify maintenance and sought to reduce the amount of his monthly maintenance payment. In August 2020, while Jon's petition to modify was pending, his employment at the new company was terminated. Jon was given a severance package whereby he received his then salary (80% of his full base salary) for six months and was also given outplacement services.

4

¶ 12       Despite the changes in his employment, Jon continued to pay Marjorie $5500 per month in maintenance and continued to contribute $1000 per month toward Marjorie's monthly mortgage payment (there was some dispute as to whether Jon had contributed to the mortgage payment for the first three months after the judgment of dissolution was entered). To make those payments, Jon pulled money from his savings each month, which caused his financial situation to get worse. To try to improve his situation, Jon began working a part-time job as a tutor with C2 Educational Systems (C2). In that position, Jon was paid $21 per hour and worked 8 to 12 hours per week. Jon also continued to look for new employment. He applied for multiple positions and had some job interviews but was ultimately unsuccessful in his job search at that time.

¶ 13       According to Jon's income records, he earned approximately $220,500 in gross income in 2020. A small portion of that income (approximately $12,600) came from C2. The remainder (approximately $207,900) was from Encore.

¶ 14       In the beginning of February 2021, Jon's severance payments from Encore ended. Jon applied for and received unemployment compensation. The amount of his unemployment compensation was slightly less than $700 per week.

¶ 15       In May 2021, the parties reached an oral settlement agreement on Jon's petition to modify and all other pending matters. Jon later filed a motion to enforce the oral settlement agreement. A hearing was held on the motion in July 2021. At the conclusion of the hearing, the trial court entered an order enforcing the oral settlement agreement and reducing Jon's maintenance payment to $2750 per month retroactive to when Jon's petition to modify was filed. Because the reduction in maintenance was retroactive, Marjorie had to reimburse Jon $15,500 for maintenance that he had already paid. The order provided further that Majorie would also pay Jon $126,000 for his interest in the marital home where Marjorie was still residing.

5

¶ 16    The day before the July 2021 court hearing, Jon was contacted by Human Capital Management Partners (HCM), one of the networking groups that he had joined, about a possible independent contractor position. Jon did not report or testify about the job lead at the court hearing because he did not know if the lead was going to amount to anything. The following week, Jon had a phone interview and was subsequently offered a position at Signode. A few days later, Jon signed an independent contractor agreement with HCM. The position was located at Signode. Jon was to be paid $55 per hour through HCM but would be responsible for paying his own taxes. Jon promptly notified Marjorie that he had obtained new employment, and Marjorie filed a petition to modify seeking to increase the amount of Jon's monthly maintenance payment. From the end of July until the middle of December 2021, Jon worked for HCM as an independent contractor. In December 2021, a position opened up directly with Signode. Jon applied for and received that position.

¶ 17    According to his income records, Jon earned approximately $95,100 in gross income in 2021. About $42,900 of that income came from Jon's work for HCM. The remainder of Jon's income for that year came from Encore (approximately $20,600), unemployment compensation (approximately $19,700), C2 (approximately $7300), and Signode (approximately $4600).

¶ 18    At the time of Jon's testimony in the instant proceeding, Jon was still employed at Signode as the HR Manager. His base pay was $120,000 per year, and he was eligible to earn a bonus. According to Jon, however, despite obtaining a higher salary, he still did not make enough money to cover all of his monthly expenses.

¶ 19    On his March 2022 financial affidavit, Jon listed his base pay at Signode as being $10,000 per month. After taxes and Jon's $2750 maintenance payment were taken out, Jon was left with a net amount of $4520 per month. Jon's living expenses were $4840 per month, but that

6

amount did not include what Jon paid each month for Rachel's college costs (the parties' daughter) and for Jon and Rachel's health insurance. Jon listed the value of his assets on his financial affidavit as being $880,000, which was comprised of retirement accounts (approximately $719,000) and non-retirement accounts (approximately $161,000). The value of Jon's investment accounts had dropped after he had prepared his financial affidavit, however, because the stock market had gone down (at least through June 2022). Marjorie's investment accounts had dropped in value as well.

¶ 20    Jon did not own a home and had been renting a place in Villa Park, Illinois, for the past two years. His rent was previously $1950 per month but had just recently been increased to $1975 when he signed a two-year extension of the lease. The parties' daughter, Rachel, lived with him at that location when she was not in college. Rachel moved in with Jon in about June 2020. Prior to that time, Rachel had lived with Marjorie. Jon recently had some medical problems with his inner ear and had to have two surgeries, one in December 2020 and the other in May 2022.

¶ 21    Jon placed the $126,000 that Majorie had paid him for his share of the marital home into his non-retirement accounts. He used a portion of that money to pay some of his attorney fees (approximately $53,200) and also to pay some of Rachel's college costs. Jon had paid approximately $15,000 in February 2021, approximately $8400 in November or December 2021, and approximately $5900 in April or May 2022 for Rachel's college costs. The college's projection was that an additional $11,200 would be owed in the near future for the upcoming spring semester, and Jon had paid $6000 or $7000 of that amount as well. Marjorie had paid approximately $9400 in February 2021 and approximately $2000 in July 2021 but then stopped making any payments toward Rachel's college costs. As a result, Rachel had to take out a student

7

loan. The parties' other three children had already completed college, and the entire cost was paid for by the family. Jon argued that the trial court should order Marjorie to pay half of the college costs (the parties had filed competing petitions for contribution to college costs that were being heard at the same time as Marjorie's petition to modify) because, according to Jon, Marjorie had a higher net worth and more financial assets than Jon.

¶ 22    At various times during the marriage, Marjorie had been employed doing payroll and accounting work. Jon believed that Marjorie was paid about $30 per hour for that work. The money that Marjorie earned went into the family account. Marjorie stopped working shortly before she filed for dissolution.

¶ 23    In approximately 1986, Marjorie earned an associate's degree in accounting and worked part-time at various points during the marriage. From 2015 to 2018, Marjorie worked for a company as a staff accountant doing payroll work. She was paid $17 to $23.50 per hour. Marjorie earned approximately $20,400 in 2015, approximately $34,600 in 2016, and approximately $39,300 in 2017 from that work. In January 2018, however, Marjorie was laid off from her position. As a result, she only made about $4900 that year. That was the last time that Marjorie worked. Marjorie was not employed in 2020 or 2021 (or, presumably, in 2019), and her only source of income during that time period was the maintenance payments that she received from Jon. Her taxable annual income was approximately $1800 in 2020 and approximately $16,000 in 2021. Marjorie was not currently employed and did not think that she was capable of obtaining a job because of her age—she was 60 years old and did not believe that anyone would hire a person that age—and because of her medical problems. Marjorie had high blood pressure, asthma, and depression and was taking daily medications for those conditions. She had applied for at least one part-time job recently but was not hired. Marjorie acknowledged during her

8

testimony, however, that the job that she had applied for was not in the accounting field and that she had the same medical conditions when she was working in 2018. Marjorie indicated further in her testimony that she had suffered some negative mental health repercussions from traumatic events that had occurred in her life since 2017, which included the parties' son attempting to commit suicide, Marjorie's mother having a stroke, and Marjorie's brother passing away. Marjorie was currently helping to care for her mother two days a week.

¶ 24     In her June 2022 financial affidavit, Marjorie listed her income as being $2750 per month—the amount of monthly maintenance that Jon was currently paying to her as provided in the July 2021 order. Marjorie's purported expenses were about $6000 per month, which left her with a significant shortfall every month. The shortfall had been occurring for about 15 months. To cover the shortfall and to pay her bills and expenses each month, Marjorie had to take money from her savings. Doing so had caused Marjorie to lose a substantial amount of the money that she had been awarded in the dissolution. In addition, the value of Marjorie's accounts had also dropped due to market conditions. As a result of those two factors, Marjorie's assets were now significantly lower than they were when Marjorie prepared her financial affidavit.

¶ 25     After the July 2021 order was entered and Jon's petition to modify was granted retroactive to the date it was filed, Marjorie paid Jon $15,500 to reimburse him for five months of maintenance that he had already paid. She also paid Jon $126,000 to buy out his interest in the marital home. The money for those two payments came from Marjorie's savings, which was part of the money that she received in the dissolution.

¶ 26     As a result of buying out Jon's interest, Marjorie now owned the marital home in Glen Ellyn, Illinois, in her name alone. The home had six bedrooms, and Marjorie currently lived in the home with the parties' daughter, Courtney. Marjorie did not require Courtney to contribute to

9

the household expenses. In January 2022, Marjorie refinanced the mortgage on the home, which allowed her to reduce the amount of her monthly mortgage payment. She obtained the loan for the refinance by listing on the loan application that she could withdraw $2000 per month from her retirement accounts (presumably, if necessary) to supplement the monthly maintenance payments that she received from Jon. Marjorie indicated in her most recent financial affidavit that the home had been appraised at $485,000. Her mortgage on the home was for approximately $145,000, which meant that Marjorie had $340,000 of potential equity in the home. Marjorie, doubted, however, that she could sell the home in its current condition or obtain another loan on the home and did not know where she and Courtney would live if she sold the home. Marjorie also did not believe that downsizing would allow her to save any money because a rental payment would probably be more than her current monthly mortgage payment.

¶ 27     Marjorie had incurred additional credit card debt since the maintenance was reduced, owed money to her attorney for attorney fees, and did not have the money to contribute to Rachel's college costs.

¶ 28     According to Marjorie, Jon had been secretive about financial matters during the parties' marriage and had, without Marjorie's knowledge, removed approximately $375,000 from one of the parties' joint accounts a few months before he moved out of the marital home in March 2018. The trial court later ordered Jon to return those funds. Marjorie did not believe that Jon had tendered all of his credit card, bank, investment, and retirement account statements in the current proceedings and had suspicions that Jon was involved in other business activity (had received other income) that he had not disclosed. Marjorie felt that Jon should pay for all of Rachel's college costs and that he should reimburse Marjorie for what she had paid toward those costs (approximately $9300). Marjorie also felt that Jon's maintenance payment should be increased

10

back to what it was previously—$5500 per month—because, among other things, Jon was fully employed, was eligible for a bonus, and was likely going to be getting a raise in the near future since he had been with Signode for a year. In addition, Jon was going to be getting an inheritance from his father's estate. Marjorie commented in her testimony that maintenance was initially set at $5500 based upon Jon's income and assets, not based solely upon Jon's income alone. Marjorie also believed that Jon should contribute toward the attorney fees that she had incurred and had filed a separate petition that was still pending requesting that relief.

¶ 29    As of her March 2022 financial affidavit, Marjorie had about $1,144,900 in assets, which was comprised of approximately $645,000 in retirement accounts, approximately $159,900 in non-retirement accounts, and about $340,000 in potential home equity. Marjorie maintained, however, that her home was not a liquid asset and re-emphasized that she did not know if she could sell her home in its current condition.

¶ 30    After analyzing the relevant statutory factors, the trial court found that a substantial change in circumstances had not occurred and that a modification of maintenance was unwarranted. The trial court also found, however, that it would not have increased the maintenance in this case, even if it had determined that a substantial change in circumstances had occurred, because doing so would have required the trial court to deviate from the statutory maintenance guidelines. Of relevance to this appeal, in making its ruling, the trial court noted that: (1) it recognized what the prior trial judge had said and done at the time of the dissolution, but the circumstances were different now than they were at that time; (2) the prior trial judge had made her determination on maintenance based upon the income levels that then existed, but the trial court in the current proceeding had to look at the circumstances that had occurred after the July 2021 modification order was entered; and (3) it appeared that neither of the parties were

11

doing better than they were at the time of the dissolution. The trial court ultimately denied Marjorie's petition to modify, and a written order was later entered to that effect. Marjorie subsequently appealed.

¶ 31                                    II. ANALYSIS

¶ 32        On appeal, Marjorie argues that the trial court erred in denying her petition to modify maintenance. Marjorie asserts that the trial court's ruling was erroneous in two respects. First, Marjorie contends, the trial court incorrectly found that no substantial change in circumstances had occurred even though it was undisputed that Jon's monthly income had more than doubled, going from about $4200 to $10,000 per month, since the prior modification order was entered (the July 2021 order). According to Marjorie, the trial court reached the wrong conclusion because it misapplied the law and incorrectly considered the circumstances that had occurred since the judgment of dissolution was entered, rather than only considering the circumstances that had occurred since the last modification order was entered as the law required. Second, Marjorie contends, the trial court incorrectly found in the alternative that no modification was warranted even if a substantial change in circumstances had occurred. Marjorie maintains that the trial court's alternative finding was wrong as well because the trial court failed to give proper deference to the prior trial judge's determination—that the maintenance guidelines were not appropriate for this case (found at the time the judgment of dissolution was entered)—or, at the very least, failed to explain why the maintenance guidelines were now appropriate. Marjorie asserts that contrary to the trial court's alternative finding, the statutory factors continue to weigh in favor of a deviation from the maintenance guidelines and the evidence presented at the hearing on the petition to modify did not demonstrate otherwise. For both of the reasons stated, Marjorie asks that we reverse the trial court's judgment denying Marjorie's petition to modify

12

maintenance, that we order an increase in Jon's monthly maintenance payment to Marjorie, and that we remand this case for further proceedings.

¶ 33    Jon argues that the trial court's ruling was proper and should be upheld. In support of that argument, Jon asserts first that the trial court correctly found that no substantial change in circumstances had occurred under the facts of the present case. Jon points out that in making its determination, the trial court conducted an evidentiary hearing on Marjorie's petition that lasted several days; considered the evidence presented, the prior maintenance orders, the credibility of the witnesses, and the arguments of the attorneys. Jon further argues that the court analyzed and addressed the relevant statutory factors and carefully set forth and explained its findings in its oral ruling. Thus, Jon contends that the trial did not commit an abuse of discretion in finding that no substantial change in circumstances had occurred. Second in support of his argument, Jon asserts that the trial court correctly found, as an alternative finding, that an increase in maintenance was not appropriate in this case, even if a substantial change in circumstances had occurred. Jon contends that the trial court gave proper deference to the prior trial judge's determination as to the applicability of the statutory maintenance guidelines but ultimately concluded that a deviation from the guidelines was no longer appropriate because the COVID-19 pandemic had caused a material change in Jon's employment/income and because neither of the parties were as well off as they were at the time of the dissolution. Jon further supports that contention by pointing to some of the facts that were elicited at the evidentiary hearing on Marjorie's petition, which included that Jon's salary was significantly less than it was at the time of the dissolution; that Marjorie had more assets than Jon; that Jon's current maintenance payment was still above the statutory guidelines amount; and that the parties' daughter, Rachel, was now living with Jon when she was not at college, and not with Marjorie. Jon maintains,

13

therefore, that the trial court's finding—that an increase in maintenance was not warranted—was supported by common sense and did not constitute an abuse of discretion. Accordingly, for all of the reasons stated, Jon asks that we affirm the trial court's judgment denying Marjorie's petition to modify maintenance.

¶ 34    A trial court's ruling on a petition to modify maintenance will not be disturbed on appeal absent an abuse of discretion. See *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24; *In re Marriage of Folley*, 2021 IL App (3d) 180427, ¶ 34. The threshold for finding an abuse of discretion is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court. See *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009); *In re Leona W.*, 228 Ill. 2d 439, 460 (2008). A trial court's ruling on a petition to modify maintenance may be affirmed on any basis supported by the record. *Heroy*, 2017 IL 120205, ¶ 24; *In re Marriage of Bostrom*, 2022 IL App (1st) 200967, ¶ 59.

¶ 35    Under section 510(a-5) of the Illinois Marriage and Dissolution of Marriage Act (Act), an award of spousal maintenance may be modified only upon a showing that a substantial change in circumstances has occurred since the last (most recent) maintenance order was entered. See 750 ILCS 5/510 (a-5) (West 2020); *Folley*, 2021 IL App (3d) 180427, ¶ 35; *In re Marriage of Osseck*, 2021 IL App (2d) 200268, ¶ 47. Simply put, a substantial change in circumstances exists when either the needs of the spouse receiving maintenance, or the ability of the other spouse to pay that maintenance, has significantly changed. See *Osseck*, 2021 IL App (2d) 200268, ¶ 47; *In re Marriage of Bernay*, 2017 IL App (2d) 160583, ¶ 18 (indicating, although somewhat implicitly, that the change that occurred must be significant). The party who is seeking a modification of maintenance bears the burden of proving that a substantial change in

circumstances has occurred. See *Folley*, 2021 IL App (3d) 180427, ¶ 35. If the trial court determines that a substantial change in circumstances exists, it may modify a maintenance award but is not required to do so. *Id.* Rather, after finding that a substantial change in circumstances has occurred, the trial court must then determine whether, and to what extent, a modification of maintenance is warranted. *Id.*; *Osseck*, 2021 IL App (2d) 200268, ¶ 48.

¶ 36   In making that determination, the trial court must consider the same factors set forth in section 504(a) of the Act that it considered when it initially awarded maintenance, which include: (1) the income and property of both parties; (2) the needs of each party; (3) the realistic present and future earning capacity of each party; (4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage; (5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought; (6) the time required for the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment; (6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment; (7) the standard of living established during the marriage; (8) the duration of the marriage; (9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties; (10) all sources of public and private income including disability and retirement income; (11) the tax consequences to each party; (12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse; (13) any valid agreement of the

15

parties; and (14) any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/504(a) (West 2020); *Folley*, 2021 IL App (3d) 180427, ¶ 36.

¶ 37 In addition to the section 504(a) factors, the trial court must also consider the factors set forth in section 510(a-5) in determining whether, and to what extent, a modification of maintenance is appropriate. 750 ILCS 5/510(a-5) (West 2020); *Folley*, 2021 IL App (3d) 180427, ¶ 37. Those factors include: (1) any changes in the employment status of either party and whether those changes were made in good faith; (2) the efforts, if any, made by the party receiving maintenance to become self-supporting and the reasonableness of those efforts; (3) any impairment of the present and future earning capacity of either party; (4) the tax consequences of the maintenance payments; (5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage; (6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage and the present status of the property; (7) the increase or decrease in each party's income since the prior judgment or order from which a modification is being sought; (8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage; and (9) any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/510(a-5) (West 2020); *Folley*, 2021 IL App (3d) 180427, ¶ 37.

¶ 38 In the present case, after reviewing the record and considering the legal principles that apply to modification of maintenance awards, we conclude that the trial court erred in finding that no substantial change in circumstances had occurred. The evidence presented at the hearing on Marjorie's petition to modify established without dispute that since the prior modification order was entered in July 2021, Jon had obtained employment directly with Signode (after first obtaining an independent contractor position at Signode through HCM) and that his monthly

16

gross income had more than doubled, increasing from approximately $4200 to $10,000 per month. As Marjorie correctly notes, Illinois courts have regularly determined that changes in income of more than 25% constitute a substantial change in circumstances. See *Osseck*, 2021 IL App (2d) 200268, ¶ 52. Based upon that case law and the extent of the increase in Jon's income in the present case, we must conclude that the trial court's finding of no substantial change in circumstances was erroneous.

¶ 39        In reaching that conclusion, we note that while Jon tries to support the trial court's finding by pointing to case law that states or suggests that a change in income alone does not generally constitute a substantial change in circumstances (see, *e.g.*, *In re Marriage of Plotz*, 229 Ill. App. 3d 389, 392 (1992) (discussing a substantial change of circumstances in the context of a request to modify child support)), we are not persuaded by that argument. We have no disagreement with the legal principle that Jon cites as a general rule, but we also recognize that at some point, a change in income reaches such a significant level that it must be deemed a substantial change in circumstances, even if it is the only change that has occurred. See *Osseck*, 2021 IL App (2d) 200268, ¶ 52 (indicating that courts in Illinois have regularly determined that a change in income of more than 25% constitutes a substantial change in circumstances). The change in Jon's monthly gross income in the present case, which more than doubled, was such a change and constituted a substantial change in circumstances. See *id.* We, therefore, reject Jon's assertion to the contrary.

¶ 40        Although we conclude that the trial court erred by finding that no substantial change in circumstances had occurred, we also determine, however, that the trial court ultimately did not commit an abuse of discretion in finding that a modification of maintenance was unwarranted (the trial court's alternative finding). In making that finding, the trial court considered the

17

evidence that had been presented, the prior modification orders, the arguments of the attorneys, and the relevant statutory factors. In addition, and contrary to Marjorie's assertion, the trial court also considered, and gave proper deference to, the prior trial judge's determination that the statutory maintenance guidelines should not be applied in this case. The trial court noted the prior trial judge's determination and stated on the record why the court was now deciding that the maintenance guidelines should be applied—because the circumstances were different than they were at the time of the dissolution, Jon's income was significantly less than it was when the prior trial judge made her maintenance determination, and neither of the parties were as well off as they were when the judgment of dissolution was entered. The court maintenance award ($2750/month) is already *above* the guideline maintenance amount. The trial court's ruling in that regard was supported by the evidence presented at the hearing on Marjorie's petition to modify and by the legal principles set forth above and was not, therefore, arbitrary or unreasonable. We, thus, conclude that the trial court properly found that a modification of maintenance was unwarranted and properly denied Marjorie's petition to modify. See *Blum*, 235 Ill. 2d at 36; *Leona W.*, 228 Ill. 2d at 460. Accordingly, we affirm the trial court's ruling.

¶ 41                                  III. CONCLUSION

¶ 42        For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

¶ 43        Affirmed.

18